No. 19,754.

THE MAY STORES SHOPPING CENTERS, INC., *v.* JOSEPH
SHOEMAKER, ET AL., AS THE BOARD OF COUNTY
COMMISSIONERS OF THE CITY AND COUNTY OF DENVER,
ETC., ET AL.
(376 P. [2d] 679)

Decided November 19, 1962. Rehearing denied December 24, 1962.

Messrs. ROTHGERBER, APPEL and POWERS, Mr. WILLIAM P. JOHNSON, for plaintiff in error.

Mr. ROBERT S. WHAM, City Attorney, Mr. W. KEITH PETERSON, Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

THIS case involves objections under C.R.S. '53, 137-3-38, to property tax assessments for the year 1958. The parties will be referred to by name or as they appeared in the trial court where plaintiff in error was plaintiff and defendants in error were defendants.

Plaintiff is the owner of 432,400 square feet of land consisting of parcels numbered 2A-6312-00-04 and 14A-6303-01-06, situated in the City and County of Denver, State of Colorado. This land is part of a complex sales area known as University Hills Shopping Center. Plaintiff uses 125,000 square feet of its land as the site of a branch store, located in the University Hills Shopping Center, and devotes the remaining part to parking facilities. The land in question was purchased in 1954 by the original plaintiff at a cost of $170,000.00 and thereafter $55,000.00 was expended for sidewalks, curbs

and other improvements. The land is zoned B-3, which at the time the land was developed required off-street parking facilities at the rate of three times the gross floor area of the building. The action involves the valuation of the land only for tax purposes.

For the year 1958 the tax assessor of the City and County of Denver assessed this land (exclusive of improvements) at $302,680.00 computed at the rate of $.70 per square foot. It appears from the record that assessments of this type in Denver are generally made on the basis of 40% of the assessed full market value as computed on the basis of sales of similar property. Thus the assessment in question would indicate that the full market value assessment of plaintiff's property under the assessor's method was approximately $760,000.00.

In the assessment of this and other commercial property located within shopping centers, the assessor for 1958 admittedly relied on what is known as the comparative-approach or rating chart method. Under this method the assessor selected the Sears Roebuck Store located in Cherry Creek Shopping Center as the optimum or model shopping center and assigned it a 100% value in seven categories, viz.: trade area, competition, drawing power, access, shape, parking and main street frontage. This percentile value was then translated into a money value per square foot for assessment purposes. In the case of the Sears Store a value of $1.20 per square foot was assigned. The assessor then rated other shopping centers in the seven categories and assigned a respective square foot value to each center. The various shopping centers within Denver were then listed on a rating chart, which contained their respective ratings in terms of the seven rating factors and their assigned square foot valuations. This rating chart constituted the primary basis for tax assessments on each tract of land within the shopping center.

In selecting the Sears Store as the model the assessor relied primarily on the fact that there had been a greater

number of realty sales in the vicinity of that store than around other shopping centers. During the period used, according to Archie Morgan, Denver's assistant deputy assessor, there were at least 20 sales of land zoned B-3 in the immediate surrounding area of the Sears Store. From an analysis of these sales the assessor computed the average selling price per square foot and front foot area. The average front foot value as indicated by these sales was then adjusted to other factors such as corner influence, and a front foot value was then assigned to the Sears Store. This front foot value was then converted into a square foot value by the use of a depth table, and from these computations the Sears Roebuck Store was assigned a value of $1.20 per square foot.

In using this comparative-approach method in the assessment of shopping center land, the assessor did not assign a separate square foot value to each parcel, but assigned the same square foot value to each parcel within the shopping center as was applicable to the shopping center in its entirety. Thus, since plaintiff's land was an integral part of the University Hills Shopping Center, it was assigned the same value per square foot as was the entire University Hills Shopping Center.

On the basis of the rating chart it was indicated that the University Hills Shopping Center should have an assessed valuation of $.82 per square foot. Since, however, this center had only been in operation approximately three years, and had not yet reached its optimum value, the rating chart valuation of $.82 per square foot was adjusted by the assessor to $.70 per square foot in order to reflect the fact that University Hills was still in a developmental period. Thus plaintiff's land, as previously stated, was assessed at $302,680.00 and a tax of $16,713.65 levied for the year 1958.

It seems appropriate to note here, even though it will be discussed more fully later, that the rating chart with the explanation as to how it was devised is the only

evidence relating to value of the subject property adduced by the defendants at the trial in the district court.

Plaintiff unsuccessfully protested its assessment and appealed to the Board of Equalization. The Board, after a hearing on December 15, 1958, denied the appeal and upheld the assessment. Plaintiff then made payment under protest and on January 5, 1959, filed its complaint in the district court under C.R.S. '53, 137-3-38, praying for a modification of the assessment and a corresponding refund.

In the presentation of its case plaintiff called as its principal witness Mr. Watson Bowes, a Colorado located but nationally recognized expert in the field of real estate appraisal. It was Bowes' opinion that, based upon several accepted methods used in the appraisal of real estate, the proper full market value of plaintiff's property was $392,000.00 and not $760,000.00 as determined by using the assessor's method. At the conclusion of plaintiff's case the defendants moved for a dismissal which the court denied on the ground that plaintiff had made a prima facie case under 137-3-38. Defendants then presented evidence calling as their only witness Archie Morgan, who was responsible for all shopping center assessments and under whose direction the assessment on plaintiff's property was made. He testified at length concerning the compilation of the rating chart and the particular assessment on plaintiff's property. At the conclusion of all the evidence the court entered judgment for defendants, approved the assessment and dismissed the action, finding in particular that the presumption of correctness which attached to the assessment at the beginning of the case had not been overcome.

Plaintiff is here by writ of error and urges numerous grounds for reversal. The principal argument, which we consider determinative, is that the rating chart which constituted the primary basis for the assessment of shop-

ping center land, was an unreliable guide for the ascertainment of market value of plaintiff's particular property for assessment purposes; thus, plaintiff argues, the assessment in question contravened the provisions of C.R.S. '53, 137-3-17.

Article X, Section 3 of the Colorado Constitution provides, in pertinent part, that taxes "shall be levied and collected under general laws, which shall prescribe such regulations as shall secure *a just and equalized valuation of all property,* real and personal * * * ." (Emphasis supplied.) In keeping with this constitutional prescription, 137-3-17 provides, inter alia:

"In determining the true value of taxable property, except as otherwise provided in this chapter *the market value shall be the guide.* As to all classes or items of property in respect to which it cannot be fairly said to have market value, the price it would bring at a fair voluntary sale thereof, the value of the use thereof, and the capability of use, together with any other just method of determination, may be considered by the assessor." (Emphasis added.)

It is not disputed that the subject property has a market value, and therefore must be assessed on that basis, and may not be assessed under the statutory provision for determining value where no market value exists. It has been defendants' position throughout this proceeding that the rating chart constitutes a reliable basis for determining such market value and that it constituted the primary basis for the assessment in question. Since defendants' witness Morgan testified that the chart played approximately a 75% role in the assessment of plaintiff's property, the issue for determination is whether the rating chart accurately reflects the market value of plaintiff's property.

We conclude that the described procedure used by the assessor, regardless of how honest or well-intentioned, can hardly serve as an accurate basis upon which

to assess property located in a different shopping center approximately five miles away in a metropolitan area. Obviously, the square foot value assigned to plaintiff's property did not reflect its value in the physical location where situated. Assuming the chart to be valid for the purpose of comparison only, it actually reflected the value which might be attributed to plaintiff's property were it located in the area of the Sears Store.

██ Defendants admitted the relevancy of comparable sales in the vicinity of a shopping center in assessing shopping center land; in fact, the valuation of the model Sears Store was based on this very factor. The accuracy or inaccuracy of those sales in determining the valuation to be assigned to the Sears Store is, we understand, the subject of a separate lawsuit, and though challenged in the motion for a new trial by plaintiff, is immaterial to our decision in the instant case. What we find to be erroneous here is the complete disregard of sales in the immediate vicinity of plaintiff's property in fixing the assessment in question, and, if there were in fact no such sales, then the complete disregard of other long accepted methods for determining market value.

For the purposes of demonstrating the wide disparity between Bowes' figures and the assessor's rating chart we shall briefly describe the former's five methods used here to arrive at the market value of the subject property:

1. Based on sales in the area a market value of subject property of $392,040.00;

2. Based on the purchase price trended to 1958 a market value of $393,750.00;

3. Based on the maximum potential sales volume that can take place in the store located on this land, which volume will not be reached for several years, a maximum market value of $439,023.00, with the 1958 value somewhat less;

4. Based on a lease of an adjoining parcel of land, a market value of $437,500.00; and

5. Comparison with similar downtown properties, an example being that plaintiff's downtown store needs .62 per cent of its gross sales to pay its realty tax, whereas the subject property at the 1958 assessed rate would require 1.07 per cent of its gross sales for such purpose. Bowes pointed out that the latter of course demonstrates the lack of uniformity obtaining here in that the subject property has approximately an 80% higher assessment.

Bowes also stated that in his expert opinion the most reliable approach was by other sales in the immediate vicinity and he believed the proper full value of the subject property to be $392,000.00.

If the accuracy of the market price valuation ·for assessment purposes placed upon the Sears Store depended upon the square foot value of land in the vicinity of Sears, surely the same should hold true of the accuracy of any valuation placed upon plaintiff's property — that is, the accuracy of this valuation should also depend upon the square foot value of land in the vicinity of plaintiff's store.

■ Due to the relative newness of the shopping center concept where large areas must be reserved for vehicular parking, it is understandable that assessors should examine properties located in such areas with the idea of seeing if they should be assessed on a different basis than similar downtown commercial properties. This, however, does not mean they must be assessed more, nor does it do away with the statutory requirement of market value as the primary basis of assessment. In connection with the new problems which have arisen due to parking areas in shopping centers Bowes testified that:

"When a large portion of land must be devoted to a use that does not produce any direct revenue (like shopping center parking areas), but in contra-distinction, a use that requires large maintenance expenditures in order to obtain satisfactory sales volumes in the erected

structures, it tends to place ceilings on the value of all shopping center land, regardless of where it is located.

"If three square feet of parking must be erected for every one square foot of selling space, the market value of the entire tract of land devoted to such use tends to be lowered when it is compared with the market value of tracts of land where smaller ratios of parking to erected space are possible."

The record discloses that the Denver tax authorities recognized that the new concept of shopping might raise new problems, for the evidence discloses that in 1957 an advisory committee was appointed by the Board of Equalization to study methods of assessment for shopping center land. It recommended that in the absence of sales of other shopping centers or an established pattern of rents upon which a rating chart could be based, the assessment should be based upon a square foot valuation predicated upon a sufficient number of sales of land in the vicinity of the shopping center. The assessor, as was his right, declined to follow all of the recommendations of such a non-statutory body. However, this did not mean that he could disregard sales in the vicinity of other shopping centers than Sears, or such of the other Bowes' type of factors as might be applicable, in arriving at such assessment.

What the court stated in *People ex rel Rhodes, County Collector, v. Turk, et al.,* 391 Ill. 424, 63 N.E. (2d) 513, 514 (1945) is applicable to the instant case:

"The assessor does not pretend to give an independent estimate of fair market value. By his sole reliance upon a formula not explained, and not shown to have any relation to market value, the appellee is in the position of having no proof of value in the record, except what appears upon the assessor's books. If this stood alone, without contradiction, it would be prima facie proof of lawful assessment, but when the assessor testifies as to how the value was arrived at, together with appellants'

110

proof, the presumptive effect of the correctness of the assessed valuation is vitiated."

Also see *People ex rel McGaughey, County Collector, v. Wilson, et al.*, 367 Ill. 494, 12 N.E. (2d) 5 (1937).

■ Actually, what a willing buyer would pay a willing seller under normal economic conditions is what market value really means. The difficulty in this type of case is how does the assessor validly arrive at it.

In *Colorado & Utah Coal Company v. Rorex*, 149 Colo. 502, 369 P. (2d) 796 (1962), we stated:

" 'In determining the true value of taxable property * * * *market value* shall be the guide.' (Emphasis supplied.) C.R.S. '53, 137-3-17. The value thus designated is simply and in essence the value which property has in exchange for money in a free market. Kistler v. Northern Colorado Water District, 126 Colo. 11, 246 P. 2d 616. It has been said many times that such value involves voluntary dealing between buyer and seller at a price the former is willing to pay and the latter is willing to take. See Wassenich v. Denver, 67 Colo. 456, 186 P. 533; Board of County Commissioners of Jefferson County v. Noble, 117 Colo. 77, 184 P. 2d 142."

[6] No evidence appears in this record from which it can be in any way inferred that in a free market plaintiff's property would have a value equal to the market value placed upon it for tax purposes by defendants. Thus no matter how elaborate the method used or how sincere the efforts of the assessor to do his job properly, if he comes out with a result like the instant one where the value arrived at is almost 100% more than that computed by accepted methods of land valuation, such a valuation is indeed "erroneous and oppressive" under the statute and amounts to constructive fraud. (See *Turk* and *Wilson*, supra.) For when there is no basis in law for an assessment it must be deemed to be contrary to the statute.

■ What we have here, in effect, is an attempted

assessment of plaintiff's land on the basis of a square foot valuation of sales of property miles away from plaintiff's land with such sales constituting the primary, if not the only, foundation upon which the attempted assessment in question was made. Such a procedure is improper and cannot be said to conform to the requirements of 137-3-17, which provides that market value shall be the guide.

 The learned trial court correctly stated at the conclusion of plaintiff's evidence that, based on the evidence before it, the assessment in question was "manifestly fraudulent, erroneous and oppressive"; however, by accepting the defendants' invalid rating chart as overcoming plaintiff's showing, it was led into error. The presumption of validity which attached to the assessor's actions had been rebutted by plaintiff's evidence. The defendants then had the duty of overcoming plaintiff's evidence which could not be done by the invalid chart in question. The presumption then was dead, devoid of all efficacy, and entitled to no force whatsoever. The trial court thus at the conclusion of the case should have granted plaintiff relief. Accordingly, as to this phase of the writ of error the case is remanded to the trial court with directions to order the assessor to lower plaintiff's assessment to an amount not to exceed that proved by plaintiff's now undisputed evidence; the plaintiff to have a refund with interest of the excess tax paid together with its costs.

In its brief plaintiff also urges several other grounds for reversal. In view of our disposition of the principal issue we need not discuss all of them. Yet, to assist future Boards of Equalization to function properly we deem it necessary to comment on at least that phase of the procedure questioned by plaintiff.

Plaintiff asserts that in the statutory hearing before the Board of Equalization (C.R.S. '53, 137-3-38) plaintiff appeared and offered its evidence. It appears that

the assessor was present as the statute permits but did not testify. In fact, defendants put on no testimonial evidence. Apparently the Board later, without notice to plaintiff and, of course, without the opportunity to cross examine, consulted with the assessor as to the challenged assessment. Defendants do not satisfactorily deny this charge but indicate that the above outlined procedure is correct and proper.

Such Board hearings as these, as distinguished from an assessor's search for pertinent information, though generally informally conducted, are quasi-judicial. Records must be kept of the proceedings and decisions must be based upon the evidence properly before the Board. It cannot be said that due process is present in a hearing when the Board later examines witnesses or evidence dehors the record and hearing. *Morgan v. United States,* 304 U.S. 1, 58 S. Ct. 999 (1937).

In *Morgan* the court held in effect that a full hearing must be a fair and open hearing requiring not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them.

Obviously, secret or informal hearings or meetings with an assessor cannot be the basis of a Board of Equalization's actions. When a hearing is mere form, where it is merely a delusive shadow without substance, there can be no due process of law. Boards of Equalization have no more right to consider unsubmitted evidence or the testimony of persons not present at the hearing than any other statutory board and such a practice, of course, should be halted.

The judgment is reversed and the cause remanded with directions to proceed consistent with the views expressed herein.

MR. JUSTICE McWILLIAMS dissents.

MR. JUSTICE HALL and MR. JUSTICE PRINGLE not participating.