## No. 25157

### The People of the State of Colorado v. Charles R. King
(510 P.2d 333)

Decided May 21, 1973.

Jarvis W. Seccombe, District Attorney, Second Judicial District, Dale Tooley, District Attorney, Silvana Del Piccolo, Deputy, Coleman M. Connolly, Deputy, Brooke Wunnicke, Chief Appellate Deputy, for plaintiff-appellant.

Rollie R. Rogers, State Public Defender, J. D. MacFarlane, Chief Deputy, Kenneth J. Russell, Deputy, for defendant-appellee.

MR. JUSTICE LEE delivered the opinion of the Court.

Appellee, Charles R. King, was charged with the murder of his wife, Barbara Jean King. He pled not guilty and not guilty by reason of insanity at the time of the alleged commission of the offense. On his motion the court ordered a bifurcated trial pursuant to 1965 Perm. Supp., C.R.S. 1963, 39-8-3. Trial on the sanity issue was to a jury. At the conclusion of all the evidence, the trial court granted King's motion for a directed verdict of insanity.

The district attorney has challenged the propriety of the court's ruling on the motion for a directed verdict, contending that under all the evidence there was a disputed question of fact concerning King's sanity, which was a matter for the jury's determination. We agree and reverse the judgment.

I.

The People's evidence disclosed that about midnight on April 9, 1970, King returned to his home, where he lived with his wife and children and his mother-in-law. He commenced arguing with his wife, who had previously gone to bed. The argument eventually developed into a violent fight. His invalided mother-in-law attempted to intervene. King thereupon seized her crutch, pushed her to the floor, and beat his wife with the crutch so forcefully that he broke it. He then shot his wife three times, killing her. He also shot his mother-in-law, wounding her in the arm and shoulder. Among the People's witnesses were two eyewitnesses to the fight and killing, the mother-in-law and a thirteen-year-old daughter of the deceased. Other witnesses included a neighbor who lived in the adjoining unit of the duplex where the homicide occurred and the arresting and investigating police officers. There was testimony that King and his wife had fought often in the past. He was characterized as being mean and a bully. He had engaged in weekend drinking bouts with some regularity. On this occasion King had been drinking and his eyes were bloodshot. But, according to his mother-in-law,

the thirteen-year-old stepdaughter and the neighbor lady, he appeared no different than on other occasions when he had been drinking.

The People's evidence further showed that after the shooting King ran down the stairs and fled out the back door where an officer was waiting. King thrust the gun into the officer's abdomen, attempting to discharge it, but it jammed. He declared to the officer, "Man, you're lucky." Upon being taken around to the front of the house, he saw his neighbor and warned her: "Eleanor, don't go into the house." She observed that he looked quite normal to her.

The arresting and investigating officers testified that King was moderately under the influence of alcohol, but was rational and appeared to understand his circumstances. He was advised of his rights on the way to the police station and seemed to understand the advisement. He inquired whether he should have an attorney. At the police station he was again advised of his rights and signed the advisement form. He asked for a lawyer and talked with the Public Defender. He thereafter declined to make any statement.

In sum, from the People's evidence, if believed, it could reasonably be inferred that under the legal definition of insanity, King was not insane but rather his actions were induced by "moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred or other motives, and kindred evil conditions" and, therefore, he was accountable to the law. 1965 Perm. Supp., C.R.S. 1963, 39-8-1.

King did not testify. His evidence consisted of the testimony of drinking companions and persons who had seen him during the hours preceding the shooting. There was evidence that King spent the afternoon drinking beer and whiskey and smoking marijuana; that he had taken some drugs, identified as tuinol, commonly known as "downers"; that he appeared angry, detached, and at some point acted like a madman; that his eyeballs were big and glassy; that he was upset; that he acted differently from other times when he had been drinking; and that he was somewhat incoherent.

Two medical doctors, one an expert in the field of clinical

toxicology, and the other a psychiatrist specializing in the areas of alcoholism and drug abuse, testified for the defense. Both were of the opinion that King was legally insane at the time of the homicide. Their opinions were based solely upon interviews with King, conducted approximately eight months after the homicide. Their respective interviews totaled two hours in length for each doctor. The history obtained from King, which they did not verify, indicated that in the late afternoon of April 9, in addition to the prolonged drinking of whiskey and beer and the taking of downers, unbeknownst to King he ingested two LSD (lysergic acid diethylamide) tablets given to him by a friend to make him feel better. Thereafter, he experienced a "bad trip" during which he hallucinated and experienced bizarre happenings, anxiety, fear, anger, disorientation, and, in short, suffered an LSD intoxication. From this history the medical experts opined that King was suffering from a toxic psychosis and was irrational; that he was out of touch with reality and not consciously able to make decisions; and that he was rendered unable to control his actions at the time of the homicide. The record discloses no direct evidence that King in fact took LSD. His doctors' opinions, however, were necessarily predicated upon the assumption that he had in fact taken LSD and had experienced a "bad trip" as he described it to them. In other words, the truth of his account was assumed for the purposes of their diagnoses.

Thus there was squarely before the court and jury the issue of whether King was accountable for the slaying of his wife. We hold that on the state of the record resolution of this question was for the jury and not for the court.

Generally, in considering a motion for a directed verdict, the trial court must consider the evidence, together with reasonable inferences therefrom, in the light most favorable to the People and, if there is substantial competent evidence to support a verdict in favor of the People, the motion must be denied and the matter submitted to the jury for determination. *Palmer v. People,* 162 Colo. 92, 424 P.2d 766; *Abeyta v. People,* 134 Colo. 441, 305 P.2d 1063; *People*

*v. Urso,* 129 Colo. 292, 269 P.2d 709; *Cartwright v. United States,* 335 F.2d 919 (10th Cir. 1964). No authority has been called to our attention which would require the application of a different rule in the trial of a criminal insanity issue. We hold this test to· be applicable to the sanity trial in determining the sufficiency of the evidence on a motion for directed verdict.

Pertinent to this discussion and the application of the rule to the evidence in this case is the fundamental principle that the credibility of the defense witnesses, including the experts, and the weight to be given to their testimony, is for the fact finder — here, the jury and not the court. The jury may well disregard the testimony of the defense witnesses in view of the various factors bearing upon their credibility and the weight of their evidence. And the jury is not bound by the testimony of the expert witnesses, which must be considered and weighed as that of other witnesses. *Hampton v. People,* 171 Colo. 153, 465 P.2d 394; *Palmer v. People, supra; Commonwealth v. Smith,* 357 Mass. 168, 258 N.E.2d 13; *People v. Krugman,* 377 Mich. 559, 141 N.W.2d 33; *Dusky v. United States,* 295 F.2d 743 (8th Cir. 1961).

## II.

Having concluded that the trial court erred in directing a verdict of insanity, the question remains whether King can be re-tried on the sanity issue. He vigorously contends that, having once been tried, he has been put in jeopardy and the court is prohibited from re-trying him under section 18 of Article II of the Colorado constitution and under the Fifth Amendment to the United States Constitution. We disagree that King was placed in jeopardy.

The constitutional prohibition against double jeopardy means that no person shall twice be put in danger of conviction and punishment for the same offense. Jeopardy occurs when a defendant in a criminal action has been brought to trial on a valid indictment or information in a court of competent jurisdiction, has been arraigned and has pleaded, and the jury has been impaneled and sworn to try

the case, charged with the defendant's deliverance. *Maes v. District Court,* 180 Colo. 169, 503 P.2d 621; *Krutka v. Spinuzzi,* 153 Colo. 115, 384 P.2d 928; *Menton v. Johns,* 151 Colo. 276, 377 P.2d 104; *Markiewicz v. Black,* 138 Colo. 128, 330 P.2d 539. More specifically, the concept of jeopardy requires that the accused be on trial for the offense charged — that he be present at a judicial proceeding aimed at reaching a *final determination* of his guilt or innocence. *People v. Chatman,* 38 Ill. 2d 265, 230 N.E.2d 879.

By enactment of 1965 Perm. Supp., C.R.S. 1963, 39-8-3, which provides for a bifurcated trial, the legislature intended that the issues of guilt and legal accountability be completely separated for trial purposes. *Curl v. State,* 40 Wis. 2d 474, 162 N.W.2d 77. King here moved for a separate trial of the insanity issue, as provided by the statute. He sought to avoid the consequences of the alleged criminal conduct. The trial of the issue of his alleged insanity could not have resulted in a finding of guilt and the imposition of punishment but only in a determination of his accountability. The judicial proceeding was not aimed at reaching a final determination on the merits of his guilt or innocence of the offense charged. *People v. Chatman, supra.* The jury was not charged with his deliverance. Thus, by the foregoing tests, King cannot be said to have been placed in jeopardy by the sanity trial.

We have examined the other argument relating to collateral estoppel and find that it has no application to the matter in controversy.

The judgment is reversed and the cause remanded for a new trial on the sanity issue.

MR. JUSTICE ERICKSON does not participate.