BOARD OF ASSESSMENT APPEALS OF the STATE OF COLORADO, Property Tax Administrator of the State of Colorado, and Grand County Board of Equalization, Petitioners,

v.

COLORADO ARLBERG CLUB, Respondent.

No. 86SC175.

Supreme Court of Colorado,
En Banc.

Sept. 19, 1988.

Anthony J. DiCola, Hot Sulphur Springs, for petitioner Grand County Bd. of Equalization.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Larry A. Williams, Asst. Atty. Gen., General Legal Services Section, Denver, for petitioners Bd. of Assessment Appeals of the State of Colo., and the Property Tax Adm'r of the State of Colo.

Karen M. Zulauf, Buchanan, Gray, Purvis & Schuetze, Boulder, for respondent.

MULLARKEY, Justice.

The Colorado Arlberg Club (Club) sought judicial review of the Board of Assessment Appeals' (Board's) final decision holding that its real property had an actual value of $1,840,585.00 and a valuation for assessment of $533,770.00 for the tax year 1983. The district court affirmed and the court of appeals reversed. *Colorado Arlberg Club v. Board of Assessment Appeals*, 719 P.2d 371 (Colo.Ct.App.1986). We granted the Board's petition for certiorari.

The Board contends that the court of appeals improperly substituted its own findings of fact for those of the Board. The Board also argues that the reasonable future use of real property is relevant to the property's present fair market value for tax purposes, and that condominium development is a reasonable future use of the Club's property. We agree with each of these points. Accordingly, we reverse and remand to the court of appeals with instructions to return the matter to the district court for reinstatement of its judgment affirming the Board's final decision.

## I.

Valuation for assessment depends on (1) the actual value of the property (2) in a statutorily-mandated base year and (3) the character of the property, *e.g.*, whether it is commercial, residential, agricultural, or mining property. With exceptions not relevant here, the first element, actual value, is "that value determined by appropriate consideration of the cost approach, the market approach, and the income approach to appraisal." § 39–1–103(5)(a), 16B C.R.S. (1983 Supp.);[1] *see also* Colo. Const. art. X, § 3(1)(a). The actual value used in a given tax year is that property's actual value during a previous year specified by statute—the "base year." *See* §§ 39–1–104(9) to (11), 16B C.R.S. (1982 & 1983 Supp.); *see also Carrara Place, Ltd. v. Arapahoe County Bd. of Equalization*, 761 P.2d 197 (Colo.1988) (discussing policy reasons for legislative adoption of base year method of appraisal). The third factor, the character of the property, determines the ratio be-

tween the property's actual value and its valuation for assessment. *See* Colo. Const. art. X, § 3(1)(b).

## II.

The Club is a nonprofit Colorado corporation which owns 125.47 acres of property near Winter Park ski area, in the Town of Winter Park, Grand County, Colorado. It originally owned the entire 160 acre parcel known as the Mary Jane Placer. In 1980, it sold thirty-five acres to Penobscot Land Corporation. That land has been developed as the Iron Horse Condominiums, which consist of 141 condominium units and approximately fourteen and one-third acres of open space. Of the land still owned by the Club, approximately twenty-eight acres are leased to the Winter Park Recreation Association. Approximately eighteen and one-quarter acres are occupied by the clubhouse facilities, where Club members and their guests sleep and eat. The remaining property, approximately seventy-nine acres, is vacant land which has been left undeveloped to preserve the Club members' privacy. All of the Club's property is subject to a planned unit development (PUD) which also applies to the Iron Horse Condominiums and to ninety acres of land owned by the City and County of Denver and leased to Winter Park Recreation Association. *See* §§ 24–67–101 to –108, 10 C.R.S. (1982) (the Planned Unit Development Act of 1972).

In tax year 1982, the Club's property had a valuation for assessment of $95,630.00. Two significant legal changes affected the property's 1983 valuation. First, the base year changed from 1973 to 1977. *See* §§ 39–1–104(9)(a), (10)(a), 16B C.R.S. (1982). Second, the ratio between the valuation for assessment and the actual value of commercial property was decreased from thirty per cent to twenty-nine per cent. *See* Colo. Const. art. X, § 3(1)(b); § 39–1–104(1), 16B C.R.S. (1982 & 1987 Supp.).

The initial notice which the Club received from the Grand County Assessor's Office for tax year 1983 stated that the Club's

---

1. Unless otherwise stated, all citations are to the statutes applicable to tax year 1983.

real property had a valuation for assessment of $647,300.00. The Club protested pursuant to section 39–5–122(2), 16B C.R.S. (1982), and as a result of a property value review the assessor decreased the valuation for assessment to $545,790.00. The Club then petitioned the Grand County Board of Equalization,[2] see sections 39–5–122(3) and 39–8–106, 16B C.R.S. (1982 & 1983 Supp.), which decreased the valuation for assessment to $533,700.00.

Still dissatisfied, the Club appealed to the Board of Assessment Appeals (the petitioner in this court) pursuant to section 39–8–108(1), 16B C.R.S. (1982). At the hearing before the Board, both the Club and the Grand County Board of Equalization presented evidence regarding the property's topography, its current zoning and use under the PUD, and its potential for use as a condominium development. The Board concluded that the testimony showed that the PUD "could probably be amended to allow additional development on the vacant land" and that the "vacant land could support a significant number of condominium units." After reviewing the appraisals and other evidence presented by each side, it affirmed the Board of Equalization's actions.

Having exhausted its administrative remedies, the Club sought judicial review in the district court pursuant to section 39–8–108(2), 16B C.R.S. (1983 Supp.). Judicial review of the Board's actions is governed by the standards set forth in the Administrative Procedure Act, section 24–4–106, 10 C.R.S. (1982). See § 39–8–108(2), 16B C.R.S. (1983 Supp.). The Club asserted that its clubhouse was residential property subject to assessment at twenty-one per cent of actual value; the seventy-nine acres of vacant land should have been valued as "open space"; and the Board had erred by failing to accept the Club's appraiser, John Kendall, as an expert. The district court concluded that the Board's findings that the

property was commercial in nature and was not limited exclusively to use as open space were supported by substantial evidence. Because the Board had allowed Kendall to testify and had considered his testimony in reaching its result, the court reasoned that its refusal to accept him as an expert was, at most, harmless error. Accordingly, the district court affirmed the Board's final decision in all respects.

The Club raised the same arguments before the court of appeals. Although the court of appeals concluded that the evidence supported the Board's classification of the property as commercial, it agreed with the Club's other contentions. Therefore, it reversed and remanded for a new hearing.

We granted the Board's petition for certiorari. The Club has not contested the valuation of the buildings on its property and the parties agree that the twenty-eight acres which the Club leases to the Winter Park Recreation Association have an actual value of $400,000.00 (or a valuation for assessment of $116,000.00). The Club no longer challenges the Board's classification of its property as commercial. Therefore, the issues before us relate only to the valuation of the remaining ninety-seven acres (the eighteen acres on which the clubhouse is located and the seventy-nine acres of vacant land). Specifically, the parties disagree about whether that land is "open space," whether reasonable future use of that land can be considered, and whether condominium development is a reasonable future use.

## III.

■ We first consider the Board's assertion that the court of appeals improperly substituted its finding that the Club's vacant land was open space under the PUD for the Board's finding that it was not.[3]

2. Except in the City and County of Denver, the board of county commissioners serves as the board of equalization. See § 39–8–101, 16B C.R.S. (1982).

3. The Board suggests that because during negotiations regarding the PUD the Club agreed that

its property would be taxed, it cannot now seek treatment of that property as "open space." The Board apparently misunderstands the Club's argument. The Club concedes that its property should be taxed, but argues that its taxes should be decreased because its "open space" is less

We agree that the court of appeals erred in this respect.

■ The Board's findings and conclusions stated in pertinent part that:

Testimony showed that the [Club] and the Winter Park Recreation Association negotiated a schematic PUD plan which was approved by Grand County officials in November 1975. The plan reserved 25 percent of the affected property as open space, but did not designate specific areas to be so reserved. The plan also included a provision under which the entire property would be subject to taxation at its fair market value. *The open space owned by the [Club] is not included in the PUD.*

. . . .

... Evidence and testimony were offered to show that the PUD plan, as amended and now governing, does not designate a maximum number of units which may be built on the property. *Testimony also showed that the PUD could probably be amended to allow additional development on the vacant land.*

(Emphasis added.) Although these findings are not a model of clarity, an agency's findings may be express or implied. *See Colorado Mun. League v. Mountain States Tel. & Tel. Co.,* 759 P.2d 40 (Colo. 1988) (citing *Aspen Airways, Inc. v. Public Utils. Comm'n,* 169 Colo. 56, 62–63, 453 P.2d 789, 792 (1969)). The underlined portions of the Board's findings and conclusions imply that (1) the vacant land was located geographically within the PUD and was subject to the PUD's restrictions, but (2) it was not included in the twenty-five per cent of the property in the PUD that was reserved for common open space. If the Board had found that the Club's vacant land was not geographically within and governed by the PUD, it obviously would not have concluded that amendments to the PUD would be necessary to allow development on that land.

The Board's finding that the Club's vacant land is included in the area subject to the PUD is supported by the final PUD plan, the legal description of the Club's property, and the witnesses' testimony. No one disputes this finding. However, the Club heatedly contests the Board's finding that the Club's vacant land is not included as "open space" under the PUD.

Common open space is "a parcel of land, an area of water, or combination of land and water within the site designated for a planned unit development designed and intended primarily for the use or enjoyment of residents, occupants, and owners of the planned unit development." § 24–67–103(1), 10 C.R.S. (1982); *see also* Grand County Planned Unit Development Regulations (PUD Regs.) Art. I, pt. VIII.A. The Club's vacant land is shown as "open space" on the PUD map. However, the testimony of John C. Mitchell, the Club's president, supports the Board's finding that the land is not "common open space" as defined in the PUD statute or regulations because it is not open to all residents, occupants, and owners of the PUD, but only to members of the Club. Mitchell testified that the vacant land is private property, that it had not been dedicated to the master association because the Club wanted to maintain it as private property, and that the Club does not want the property "used for anything."

■ Indeed, in this court the Club concedes the undeveloped land was not common open space, arguing only that it should have been taxed as "private open space" pursuant to sections 39–1–102(7.5) and (12.3), 16B C.R.S. (1982) (repealed effective May 20, 1987). Section 39–1–102(7.-5) provided that " 'Land used for open space-residential purposes' means land of up to thirty-five acres, part of which is used for residential and related purposes and part of which is used for open space." Because section 39–1–102(12.3), which defined "[p]ortion of land used for open space," did not require such land to be available to the public, the Club refers to this provision as authorizing private open space. However, the Board classified the Club's property as commercial, not residential, and that classification is not chal-

valuable than a tract the same size which is available for commercial development.

lenged before this court. Because no portion of the Club's property is used for "residential and related purposes" as defined by section 39–1–102(12.4), 16B C.R.S. (1982), its land did not qualify as "private open space."

In short, the Board's finding was supported by competent evidence. The administrative agency, not the reviewing courts, has the task of weighing the evidence and resolving any conflicts. *See Colorado Mun. League*, 759 P.2d 40, 44; *G & G Trucking Co. v. Public Utils. Comm'n*, 745 P.2d 211, 216 (Colo.1987); *Marek v. State, Dep't of Revenue, Motor Vehicle Div.*, 709 P.2d 978 (Colo.Ct.App.1985) (if evidence is conflicting, reviewing court may not substitute its judgment for that of the fact finder). A reviewing court may not set aside a decision by the Board of Assessment Appeals unless it is "unsupported by any competent evidence." *Board of County Comm'rs v. Colorado Bd. of Assessment Appeals*, 628 P.2d 156, 158 (Colo.Ct.App.1981). *See generally* § 24–4–106(7), 10 C.R.S. (1982) (reviewing court can set aside agency action if, *inter alia*, it is "based upon findings of fact that are clearly erroneous on the whole record, [or] unsupported by substantial evidence when the record is considered as a whole"). Therefore, the court of appeals erred by reweighing the evidence and rejecting the Board's finding that the Club's property was not "open space" under the PUD.

### IV.

The next question before this court is whether the court of appeals was correct to conclude that the Board could not consider reasonable future use of the Club's property to determine its present fair market value. We have explained that market value is "what a willing buyer would pay a willing seller under normal economic conditions." *May Stores Shopping Centers, Inc. v. Shoemaker*, 151 Colo. 100, 110, 376 P.2d 679, 683 (1962) (tax case); *Fellows v. Grand Junction Sugar Co.*, 78 Colo. 393, 242 P. 635 (1925) (tax case); *see also Goldstein v. Denver Urban Renewal Auth.*, 192 Colo. 422, 560 P.2d 80 (1977) (eminent do-

main case); *Department of Highways v. Schulhoff*, 167 Colo. 72, 445 P.2d 402 (1968) (eminent domain case); *Vivian v. Board of Trustees*, 152 Colo. 556, 383 P.2d 801 (1963) (eminent domain case). *See generally* CJI–Civ.2d 33:3 (defining reasonable market value for eminent domain proceedings). Our definition is consistent with the basic definition of market value used by appraisers:

> The most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 33 (8th ed. 1983); *see also* Comment, *The Road to Uniformity in Real Estate Taxation: Valuation and Appeal*, 124 U.Pa.L.Rev. 1418, 1430 (1976) (market value is defined as the price reached "in a fair, arm's length transaction between willing parties") (footnote omitted).

As the court of appeals acknowledged, we have ruled that reasonable future use is relevant to market value in several eminent domain cases. *See, e.g., Stark v. Poudre School Dist. R–1*, 192 Colo. 396, 398, 560 P.2d 77, 79 (1977) (effect of rezoning on present market value may be considered if it rises to level of a probability); *Schulhoff*, 167 Colo. 72, 445 P.2d 402 (quoting *Wassenich v. City & County of Denver*, 67 Colo. 456, 466–67, 186 P. 533, 537 (1919), which held that "[a]ny reasonable future use" could be considered); *see also State Dep't of Highways, Div. of Highways v. Ogden*, 638 P.2d 832, 834 (Colo.Ct.App.1981) (jury should have been allowed to consider "most advantageous use to which the property could be put"). However, the court of appeals reasoned that because the "assessor can periodically reassess the tax on a property, based on changes in the property's use, on new improvements, or on changes in present market value ... equity dictates that the principles of the law of eminent

domain not be transferred to tax assessment situations." *Colorado Arlberg Club,* 719 P.2d at 373. For several reasons, we disagree.

First, the one-time nature of an eminent domain payment has nothing to do with our rule that reasonable future use must be considered in calculating just compensation for a government taking. Instead, reasonable future use is considered because it is relevant to the property's present market value. *See Board of County Comm'rs v. Vail Assocs.,* 171 Colo. 381, 388, 468 P.2d 842, 845 (1970) ("It is fundamental that evidence of the highest and best use to which the property may reasonably be applied in the future by [people] of ordinary prudence and judgment is admissible to assist the commission or jury in arriving at the present cash market value of the property being taken."). For example, a tract of undeveloped land with potential for development has a higher present fair market value than the same size tract of undeveloped land with no such potential, *i.e.,* even in its undeveloped state, a willing buyer and a willing seller would agree on a higher price for it.

■ Given this rationale, it becomes clear that the fact that periodic reassessments and reassessments based on certain "unusual conditions" pursuant to section 39–1–104(11)(b)(I), 16B C.R.S. (1983 Supp.), are permitted in tax cases is irrelevant to the concept or calculation of a property's present fair market value for tax assessment purposes. Because the distinction relied on by the court of appeals provides no basis for analysis, and because the legislature has never indicated that it intended the words "market approach" or "market value" to be given any special meaning for tax purposes, our common law interpretation applies. *See Allen v. People,* 175 Colo. 113, 116, 485 P.2d 886, 887–88 (1971) ("the common law may be used in aid of the meaning to be given statutory language when such language is not defined in the statute"); 2A N. Singer, *Sutherland's Statutory Construction,* §§ 47.30, 50.03 (Sands 4th ed. 1984 rev.).

A second reason for considering reasonable future use is that it is one element of the technical meaning of market value. It is a well-established rule of statutory construction that "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." § 2–4–101, 1B C.R.S. (1980). *See generally* 2A N. Singer, *supra,* § 47.29 (in absence of contrary evidence, "technical terms or terms of art used in a statute are presumed to have their technical meaning").

"In the market, the current value of a property is not based on historical prices or cost of creation; it is based on what market participants perceive to be the future benefits of acquisition." American Institute of Real Estate Appraisers, *supra,* at 21; *see also* Comment, *supra,* 124 U.Pa.L.Rev. at 1431–32 (comparable sales method to determining market value involves "taking into consideration all uses to which the property is adapted and *might be applied*") (footnote omitted and emphasis added). Accordingly, a property's "highest and best use," which is "[t]he use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, that results in highest land value," is a "crucial determinant of value in the market." American Institute of Real Estate Appraisers, *supra,* at 28, 243. Further, the Board clearly considered the property's future use to be relevant to its present market value and "[t]he construction of statutes by administrative officials charged with their enforcement should be given deference by a reviewing court." *Hewlett–Packard Co. v. State, Dep't of Revenue,* 749 P.2d 400, 406 (Colo.1988).

Finally, while we recognize that some courts have been reluctant to allow consideration of future uses in tax assessments, many of the cases on which the Club relies involved assessments based on future uses that were speculative or impossible. *See, e.g., People ex rel. Empire Mortgage Co. v. Cantor,* 197 A.D. 437, 189 N.Y.S. 646 (1921) (reliance on fanciful "prophetic vision" of development was "even more ab-

surd" in tax case than in eminent domain case); *Finch v. Grays Harbor County*, 121 Wash. 486, 209 P. 833 (1922) (when cost of clearing land would exceed its value, much of the land could never be drained, and there was no demand for use on which assessor relied, "valuation was grossly excessive").

Other cases cited by the parties prohibit valuing undeveloped property as if it had been improved. *See, e.g., City of Newark v. West Milford Township, Passaic County*, 9 N.J. 295, 88 A.2d 211, 215 (1952) (value must be based on "actual condition in which the owner holds it" and assessor cannot ignore lack of public utility service or value land as though it already were subdivided); *Allied Stores, Inc. v. Finance Adm'r*, 76 A.D.2d 835, 428 N.Y.S.2d 316 (1980) (not permissible to determine that property's actual use was no longer viable and to value it as though it had been used more profitably). As explained in Part V below, these limitations apply to both eminent domain and tax cases in Colorado, and do not preclude consideration of *reasonable* future uses.

The Club also relies on several New York cases which state an absolute rule that only the property's current use can be considered for tax assessments. *See, e.g., Addis Co. v. Srogi*, 79 A.D.2d 856, 434 N.Y.S. 2d 489 (1980), *appeal denied*, 53 N.Y.2d 603, 439 N.Y.S.2d 1026, 421 N.E.2d 853 (1981); *Kalski v. Fitzgerald*, 25 A.D.2d 573, 266 N.Y.S.2d 620 (1966). However, a New York statute explicitly requires that real property be taxed "according to its condition and ownership" on March 1 of the tax year. *See* N.Y.Real Prop.Tax Law section 302.1 (McKinney 1988 Supp.). The reasoning of cases decided under that statute does not apply here because our statute does not preclude consideration of future uses.

Other states with statutes more similar to ours, requiring only that the assessment be based on the property's full and fair value, have recognized that "the normal uses to which potential purchasers could put [the property] must be considered" because that is part of the property's market

value. *Pacific Mut. Life Ins. Co. v. County of Orange*, 187 Cal.App.3d 1141, 1148, 232 Cal.Rptr. 233, 236 (1985); *see also Wild Goose Country Club v. Butte County*, 60 Cal.App. 339, 212 P. 711, 712 (1922) (in valuing property for tax purposes, "[t]he question is, not what its value is for a particular purpose, but its value in view of all the purposes to which it is naturally adapted."); *Division of Tax Appeals v. Township of Ewing*, 72 N.J.Super. 238, 178 A.2d 229, 231 (1962) ("assessor must consider the possibility of sale to a buyer who intends a different use, unless such possibility is so remote as to have no real bearing upon current value"). N.J.Stat.Ann. section 54:4–23 (West 1986) provides that the assessor shall "determine the full and fair value" based on the price which the property "would sell for at a fair and bona fide sale." That definition is similar to our definition of market value, and we agree with the distinction stated by the New Jersey Superior Court:

> An assessor who values a farm as though actually subdivided into the building lots of a residential development, when in fact that has not yet occurred, would be in error; but he would also err if he refuses to consider that a developer would pay a higher price for the farm than another farmer.

*Division of Tax Appeals v. Township of Ewing*, 178 A.2d at 232.

To summarize, the reasonable future use of real property is an element of its fair market value under its technical definition as well as its common law interpretation in Colorado and elsewhere. Because there is no indication that the legislature intended to reject or distinguish those definitions here, we conclude that reasonable future use is relevant to a property's current market value for tax assessment purposes. The court of appeals' contrary holding was erroneous.

## V.

We now turn to the key question—whether condominium development was a reasonable future use of the Club's property. As the Club correctly notes,

speculative future uses cannot be considered in determining present market value. *See, e.g., Board of County Comm'rs v. Vail Assocs.*, 171 Colo. at 388–89, 468 P.2d at 846; *Schulhoff*, 167 Colo. at 75–79, 445 P.2d at 404–06. In addition, the Board cannot assess the property at the value which it will have after being subdivided and developed to its highest and best use. An anticipated development cannot be viewed "as an accomplished fact," because such an approach would ignore the substantial but unknown costs involved in such a development. *Schulhoff*, 167 Colo. at 77, 445 P.2d at 405 (because cost of subdividing is speculative, cannot value property as if subdivision had been accomplished); *City of Aurora v. Webb*, 41 Colo.App. 11, 15, 585 P.2d 288, 292 (1978). Instead, the property's highest and best use is only relevant to the Board's determination of the price on which a willing buyer and a willing seller would agree for the property *in its present condition. Board of County Comm'rs v. Vail Assocs.*, 171 Colo. at 388–89, 468 P.2d at 846 (compensation is for value of land "as it exists at the time of the condemnation, taking into consideration its highest and best future use").

▮ If the Board's findings are consistent with these limitations on the consideration of future use and are supported by competent evidence, they cannot be ignored or rejected by the reviewing courts. *See Board of County Comm'rs v. Colorado Bd. of Assessment Appeals*, 628 P.2d at 158; *see also Colorado Mun. League*, at 44.

The Club attacks the Board's findings regarding the potential for development on three grounds. First, it asserts that the appraisal method used by Kenneth McTaggart, the appraiser called by the Board of Equalization, was improper because he valued the land on a "per unit" basis and allegedly ignored important factors such as the cost of utilities and sanitation. Second, the Club contends that the possibility of

rezoning to allow development was speculative and should not have been considered. Finally, the Club argues that its land was too steep to allow development. As explained below, none of these attacks is persuasive.

### A.

▮ At the hearing before the Board, McTaggart was accepted as an expert on the value of real property. To determine how many condominium units could be built on the Club's property, McTaggart compared the land to the Iron Horse Condominiums, the development built on the adjoining tract of land which the Club had sold in 1980. That development had a density of 4.08 condominium units per acre. Because the Club's property had more steep areas, McTaggart concluded that it was only "two-thirds as developable" as the Iron Horse Condominiums and that an average of 2.72 condominium units per acre could be built on the Club's property. These figures resulted in a determination that 265 units could be built (2.72 units per acre multiplied by 97.47 acres). McTaggart acknowledged that some portions of the Club's property were too steep for development but stated that 265 units could be clustered in the flatter areas and could be built in one corner, on a sixteen to twenty-five acre parcel, leaving forty per cent of the Club's property undeveloped.

He then used the comparable sales method of appraisal,[4] which means he calculated the value of the Club's property based on recent sale prices of similar undeveloped properties. This accepted method of determining fair market value has been described as "the most accurate method." Comment, *supra*, 124 U.Pa.L.Rev. at 1431. McTaggart determined the comparable properties' sale prices per acre (the per acre method) and their sale prices per potential condominium unit that could be built (the per unit method). He concluded that the ninety-seven acres had an actual value

---

4. McTaggart's appraisal did not satisfy the limitations on use of comparable properties set forth in section 39–1–103(8), 16B C.R.S. (1982 & 1983 Supp.), but since neither the parties, nor the lower courts, nor the administrative decision-makers addressed the effect of this defect, that issue is not before us.

of $1,600,000.00. Added to the $400,000.00 actual value of the twenty-eight acres leased to the Winter Park Recreation Association, this resulted in an actual value of $2,000,000.00 and a valuation for assessment of $580,000.00.

The Club's appraiser, John Kendall, was not accepted as an expert witness, but was allowed to testify as to his valuation of the land. Kendall believed that the property's highest and best use was development as permitted by the PUD. Without amendments to the PUD, thirty-one units could be built on the parcel where the clubhouse was located and no units could be built on the vacant land. Like McTaggart, Kendall used the comparable sales method of appraisal;[5] however, Kendall compared the properties using only the per unit method and did not consider the per acre method. He obtained a similar per unit value for the property, but because his appraisal was based on the potential for building only thirty-one condominiums, it resulted in an actual value of only $217,000.00 for the ninety-seven acres in dispute. Added to the $400,000.00 actual value of the twenty-eight acres leased to the Recreation Association, this resulted in an actual value of $617,000.00 and a valuation for assessment of $178,930.00.

The Club asserts that McTaggart's appraisal was speculative and inadmissible because it valued the land on a per unit basis. As we explained in *Herring v. Platte River Power Authority*, 728 P.2d 709, 712 (Colo.1986), the *Schulhoff* rule precludes reliance on sales of subdivided property to determine the value of unsubdivided land under the comparable sales method. In the case now before us, both appraisals were based on sales of other unsubdivided land, which resulted in an actual value of approximately $7,000.00 per potential condominium unit. The Club has never suggested that a completed condominium unit in a subdivision located between Winter Park and Mary Jane ski areas would sell for only $7,000.00 and the record makes clear that the valuation was

based on the undeveloped property's potential for development, not on the assumption that the subdivision and development had been completed. In addition, the Club's appraiser, Kendall, relied solely on the per unit method in his valuation, explaining that the price a buyer would pay would be determined by how the land could be developed and that "value per acre doesn't tell you anything." Under these circumstances, the Board's reliance on the per unit appraisal method was not error.

 The Club also argues that McTaggart's appraisal ignored important factors such as the cost of utilities and sanitation. Neither appraiser explicitly considered these factors, but, as explained above, it is clear that neither valued the property as if it were subdivided and the condominiums were built. If the cost of building the units or their marketability was not considered, it was the Club's burden to present evidence regarding these factors and to show that the assessor and the Board of Equalization had erred by ignoring them. *See* § 24–4–105(7), 10 C.R.S. (1982). Instead of presenting such evidence, the Club called Kendall, whose appraisal did not differ from McTaggart's as to the per unit market value of the land, suggesting that he agreed with McTaggart as to the effect of these factors. Therefore, the Club failed to meet its burden of proof.

### B.

 Having rejected the Club's attacks on McTaggart's appraisal method, we now turn to its challenges to the factual assumptions underlying his valuation. We have explained previously that evidence of possible rezoning is admissible in an eminent domain proceeding if "it would reasonably be reflected in present market value," *i.e.*, if it "rises to the level of a probability." *Stark*, 192 Colo. at 398, 560 P.2d at 79. The same standard applies here. Therefore, the question is whether the evidence supported the Board's finding that

---

5. Kendall's appraisal also failed to comply with the requirements set forth in section 39–1–103(8), 16B C.R.S. (1982 & 1983 Supp.), but

because the question of the effect of this failure was not preserved for review, we do not decide it.

the PUD probably could be amended to allow development on the Club's land.

The evidence in this case showed that several changes in the density requirements had been permitted subsequent to the adoption of the PUD in 1980. No evidence was presented that any request for an increase ever had been denied. The Mary Jane day center, which is located on property designated as "open space" on the final PUD, dramatically illustrates the potential for development of "open space."

Phillip D. DelVecchio, planning director for the Town of Winter Park, testified that the Town of Winter Park [6] had freely permitted increases in residential density and had "exercised great caution" only regarding the amount of commercial space. He estimated that the approved density of Denver's land located in the PUD had increased by 300 per cent and agreed that, as of January 1, 1983, conditions in the Town of Winter Park had changed sufficiently to allow additional amendments. He explained that an application for amendment initially would be evaluated based on the underlying zoning, and that the underlying zoning for the Club's vacant land allowed twenty-eight units per acre and required forty per cent of the land to be reserved as open space.

Steve Amsbaugh, director of planning for the Winter Park Recreation Association, testified that the PUD had been amended "frequently." Ray Moody, Jr., who was the county manager for Grand County at the time of the hearing and had been director of planning for the county when the PUD was adopted, testified that the PUD is "an interim step to get to the end result, which is the platting process," [7]

that it is "similar to a sketch," and that, while the "plats should conform as closely as possible" to the PUD plan, the PUD is not binding. Herbert A. Ritschard, Chairman of the Board of Grand County Commissioners at the time the PUD was adopted, testified that the Board intended to "allow substantial development to occur on the City land and the Arlberg Club land." In addition, because only twenty-five per cent of the property was required to be open space under the county regulations, see PUD Regs. Art. III, pt. II.A, much of the area could be developed without violating the open space regulations.

We recognize that the land is designated as open space on the PUD map and that the Town of Winter Park must approve any changes in the PUD. DelVecchio testified that the Town of Winter Park requires a letter showing that water and sewer facilities are available or could be installed prior to approving increases in density. The statute requires a public hearing prior to substantial modification. § 24-67-106(3)(b), 10 C.R.S. (1982). Because no evidence was presented that a change in the plan had been requested, that a public hearing had been held, or that water and sewer facilities were or could be made available, the record does not establish definitively that an amendment allowing some of the "open space" to be used for condominiums would be approved. However, it contains competent evidence sufficient to support the Board's finding that such an amendment probably would be approved and, therefore, the court of appeals erred by substituting its judgment for the Board's on this issue.

---

**6.** The Club was in the unincorporated part of Grand County when the PUD was adopted. Later, it was annexed to the Town of Winter Park. As a result of the annexation, although Grand County approved the PUD, the Town of Winter Park now has responsibility for granting or denying requests for amendments to the PUD. See §§ 24–67–104 and –106, 10 C.R.S. (1982) (county may authorize and amend PUD's in unincorporated portion of county; municipality has that authority within its corporate limits). DelVecchio testified that the Winter Park Planning and Zoning Commission and Utilities

Council were responsible for making recommendations to the Town Council, which had authority to grant or deny requested amendments.

**7.** " 'Plat' means a map and supporting materials ... prepared ... for recording of real estate interests with the county clerk and recorder." § 30–28–101(5), 12A C.R.S. (1986). Approval and filing of a final subdivision plat is a prerequisite to construction and sale. See PUD Regs. Art. II, pt. I, Step 6A.

## C.

 The evidence regarding whether condominium development was physically feasible also was conflicting. Portions of the property are quite steep, and Amsbaugh and Mitchell both testified that the vacant land was too steep for ski runs. Kenneth Egan, a Club member who had been on the committee which worked on the PUD, explained that the vacant land was designated as open space "because it's undevelopable." Amsbaugh also asserted that open space was · generally "hard-to-build-on areas," but he conceded that about half of the Club's vacant land was developable. As noted in part V.A., McTaggart testified that because of the steep areas, the Club's property was only two-thirds as developable as the adjoining thirty-five acre parcel. He explained that he did not envision each acre of the Club's land being equally developed and that the 265 condominium units which he considered the highest and best use of the property could all be clustered on a sixteen to twenty-five acre parcel. This evidence is sufficient to support the Board's finding that significant development was feasible.

## D.

 Because, based on competent evidence, the Board found that the PUD probably could be amended and that the property was not too steep for condominium development, its consideration of McTaggart's appraisal was not improper reliance on a speculative or impossible future use. Instead, the Board acted properly by ascertaining the property's market value based on its current condition and its reasonable future use for condominium development. The court of appeals erred by ignoring the

evidence which established the probability of amendments to the PUD and the feasibility of development and by overruling the Board's findings.

## VI.

Because the Board's decision was supported by competent evidence and was based on a correct interpretation of market value, the court of appeals erred by reversing it and remanding this matter for a new hearing.[8] Accordingly, we reverse the judgment of the court of appeals and remand the matter with instructions to return it to the district court for reinstatement of its judgment affirming the Board's decision.

ERICKSON, J., specially concurs.

ROVIRA and VOLLACK, JJ., do not participate.

ERICKSON, Justice, specially concurring:

The majority opinion utilizes the "highest and best use" standard of valuation as developed in eminent domain cases and applies it in a property taxation context. As an element of this valuation method, the majority holds that future use of real property may be considered in determining the property's actual value for tax purposes.

A number of other jurisdictions have followed the same basic rationale, but have set forth a limitation in reaching a value for tax purposes, which requires that future use must be reasonable, not speculative or elusive in nature. *Application of Rosewell,* 120 Ill.App.3d 369, 75 Ill.Dec. 953, 458 N.E.2d 121 (1983); *City of Newark v. West Milford TP,* 9 N.J. 295, 88 A.2d 211 (1952); *Hackensack Water Co. v. Ha-*

---

8. The Club asserts that regardless of our ruling on all other issues, we must remand for a new hearing at which its appraiser is accepted as an expert. Although he was not accepted as an expert, the Club's appraiser was permitted to present his opinion of the land's value and to testify about the methods used in his valuation. *See* CRE 701. The Club apparently is concerned that the Board gave undue weight to McTaggart's testimony. An expert's opinion is not binding on the fact finder, but should be considered and weighed together with the other

evidence. *See People v. King,* 181 Colo. 439, 510 P.2d 333 (1973); *Young v. Burke,* 139 Colo. 305, 307, 338 P.2d 284, 285 (1959) ("the court, when sitting as a trier of the facts, ... is the final judge of the weight and credibility of the witnesses, including expert witnesses"); CJI-Civ.2d 3:15 (1980). Because the Board had discretion to decide which appraiser's opinion was more credible, regardless of whether it accepted Kendall as an expert, its ruling on this issue was, at most, harmless error and is not grounds for a new hearing. *See* C.R.C.P. 61.

*worth,* 178 N.J.Super. 251, 428 A.2d 934 (1981); *Finch v. Grays Harbor County,* 121 Wash. 486, 209 P. 833 (1922). Even though the majority in determining the appropriate tests that may be used in valuing real property allows for the "highest and best use" standard, in my view, this standard and the "reasonable future use" test should be restricted. Because the assessment process, unlike the condemnation process, is flexible and may be altered in subsequent years, speculation should not be permitted in the determination of actual value for tax purposes. Consideration of future use should be restricted by tying the determination of actual value of real estate to concrete factual circumstances.

In my view, if an assessor is allowed to drastically increase an assessment based upon future use, such an increase should be subject to the strictest judicial scrutiny. By definition, even a "reasonable" future use is to a large degree speculative because it allows for the taxing of non-existent improvements of an assumed type and quality. As is exemplified in the present case, the majority's holding enables an assessor to value an identical piece of vacant land in 1982 at $95,630 and then at $545,790 in 1983, an increase of over 500 per cent without any evidence of construction or improvement of the land. Such a sharp increase in the assessment infringes upon article X, section 3 of the Colorado Constitution, providing that real and personal property shall be taxed at its *actual value.* This assessment also flies in the face of the legislative mandate that parallels the Colorado Constitution and requires that real property shall be taxed according to its actual value. *See* § 39–1–101, 16B C.R.S. (1982).

In my opinion, the more prudent assessment method would be to assess the vacant land only as vacant land at least until the time that the use of the land is known, or can be determined with a reasonable degree of certainty. At that time, the assessor could reevaluate the real property, pursuant to section 39–1–104(11)(b)(I), 16B C.R.S. (1982). Section 39–1–104(11)(b)(I) specifically provides for reevaluation during intervening years when there has been a "change in the use of the land." The construction of a condominium complex on vacant land would fall within the ambit of a change in the use, and the assessment could be increased accordingly. This method would allow for correct tax assessments while protecting against possible assessor abuses in the form of taxation upon speculation.

At a minimum, however, rather than state a per se rule as announced by the majority, namely, that "reasonable future use is relevant to a property's current market value for tax assessment purposes," I would hold that whether future use is relevant to such a determination should depend on the facts of each case. Because I find adequate support in the record for the reasonable future use of the Club's land for the development of condominiums, I believe the *Board's increased assessment was supported by the record and should be affirmed.*