2022 CO 9 Lodge Properties, Inc. and Board of Assessment Appeals Petitioners v. Eagle County Board of Equalization. Respondent No. 20SC852
Supreme Court of Colorado, En Banc
February 22, 2022

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 19CA266

 Attorneys for Petitioner Lodge Properties, Inc.: Bryan Cave
 Leighton Paisner LLP Michael J. Hofmann Zachary W. Fitzgerald
 Denver, Colorado Brownstein Hyatt Farber Schreck, LLP Julian
 R. Ellis, Jr. Denver, Colorado

 Attorneys for Petitioner Board of Assessment Appeals: Philip
 J. Weiser, Attorney General Evan P. Brennan, Assistant
 Attorney General Denver, Colorado

 Attorneys for Respondent: Bryan R. Treu, Eagle County
 Attorney Christina C. Hooper, Senior Assistant County
 Attorney Eagle, Colorado Hamre, Rodriguez, Ostrander &
 Dingess, P.C. Donald M. Ostrander Richard F. Rodriguez Steven
 Louis-Prescott Joel M. Spector Denver, Colorado

 Attorneys for Amicus Curiae Colorado Counties, Inc.: Hall
 & Evans, LLC Andrew D. Ringel Ethan E. Zweig Denver,
 Colorado

 Hamre,
 Rodriguez, Ostrander & Dingess, P.C. Donald M. Ostrander
Richard F. Rodriguez Steven Louis-Prescott Joel M. Spector
 Denver, Colorado

 Attorneys for Amicus Curiae Colorado Counties, Inc.: Hall
 & Evans, LLC Andrew D. Ringel Ethan E. Zweig Denver,
 Colorado

 JUSTICE GABRIEL delivered the Opinion of the Court, in which
 CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE
 HOOD, JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.

 GABRIEL JUSTICE

 ¶1
This case involves the valuation for real property tax
 purposes of the Lodge at Vail ("the Lodge"), a
 luxury resort property that includes a hotel, privately owned
 condominiums, and amenities. We granted certiorari to
 consider whether (1) fees paid by the condominium owners to a
 third-party company that manages the rental of their
 condominiums to overnight guests is intangible personal
 property that must be excluded from the actual value of the
 Lodge under the income approach to valuation and (2) the net
 income generated from such fees should be included in the
 Lodge's actual value under the income
 approach.[1]

 ¶2
We now conclude that the net income generated from rentals of
 the individually and separately owned condominium units was
 not income generated

 by the Lodge and therefore should not have been included in
 the Lodge's actual value under the income approach to
 valuation.

 ¶3
We therefore reverse the judgment of the division below, and
 we need not consider whether the contractual right to net
 rental management income generated from the condominiums
 constituted intangible personal property that must be
 excluded from the Lodge's actual value under the income
 approach to valuation.

 I.
Facts and Procedural History

 ¶4
 The Lodge is a full-service resort located at the base of the
 Vail Mountain ski area. Opened in 1962 and owned by
 petitioner Lodge Properties, Inc. ("LPI"), a
 subsidiary of Vail Resorts, the Lodge now has eighty hotel
 rooms and a variety of amenities, including a spa, a fitness
 complex, a ski valet, a pool, two restaurants, and a pool bar
 and grill.

 ¶5
 Additionally, in 1970, private condominiums were constructed,
 creating a north wing of the Lodge and expanding its south
 wing. Accordingly, in addition to the hotel rooms and
 amenities noted above, the Lodge's current building
 envelope includes seventy-four individually owned residential
 condominium units.

 ¶6
Some of the owners of these condominium units choose to rent
 their units to the public for a fee. These owners have the
 option of using third-party rental

 management companies to assist with this process, and many
 have contracted with Vail/Beaver Creek Resort Properties
 ("VBC"), another subsidiary of Vail Resorts, to
 provide rental management services. The remainder of the
 condominium owners either manage the rental process on their
 own, contract with competitors of VBC, or choose not to rent
 their properties.

 ¶7
 As to those condominium owners who contract with VBC, their
 contracts are for a one-year term, which renews automatically
 at the end of each year, unless either party gives notice of
 nonrenewal not later than sixty days before the end of the
 then-current term. In addition, these condominium owners may
 terminate their contracts, with or without cause, upon giving
 ninety days' prior written notice. And the contracts
 automatically terminate upon the transfer of title to the
 units by the owners.

 ¶8
 The contracts further provide that VBC may assign its
 interest in the contracts, without the owners' prior
 written consent, to any entity that acquires VBC or the
 Lodge's owner.

 ¶9
 Pursuant to these contracts, VBC agrees to provide to the
 condominium owners, among other things, booking and other
 rental management services, daily housekeeping services,
 marketing, and routine repairs and minor maintenance in the
 condominiums. The contracts also state:

Manager will provide Hotel Guests and Owner access to all
 amenities within the Hotel that are available to other guests
 of the Hotel,

 including ski storage while Owner or Owner guests are
 residing in the Unit, internet access, pools, hot tubs,
 saunas, exercise facilities, and beauty salons and spas as
 they may exist from time to time (collectively, the
 "Amenities").

 ¶10
 In exchange for the above-described and other services
 provided by VBC under the contracts, the condominium owners
 agree to pay VBC a management fee of forty percent of the
 gross rental proceeds.

 ¶11
 Despite differences in ownership, as noted above, the
 Lodge's hotel rooms and the condominiums are all within
 the Lodge's building envelope, and to that extent, they
 are physically integrated, such that a typical guest might
 not know when they are in the condominiums and when they are
 in the hotel. As part of this physical integration, the
 condominiums and hotel rooms share an elevator, several
 stairways, and certain utility lines and equipment.

 ¶12
 As pertinent here, condominium owners are required to join a
 condominium association, which collects fees that help offset
 the costs of guest services, housekeeping and maintenance,
 bell and concierge services, ski storage, maintenance and
 repair of the pool, and other amenities on site. In addition,
 guests who stay at the hotel and those who rent a condominium
 pay a nightly resort fee, which affords all such guests
 access to many of the Lodge's amenities.

 ¶13
 Prior to 2017, the Eagle County assessor did not include in
 its calculation of the Lodge's assessed value the net
 income that VBC received in connection with its contractual
 services for the condominium owners. In 2017, however, the

 assessor, apparently for the first time, included such income
 in the calculation of the Lodge's assessed value. As a
 result of this change in methodology, the assessor assigned
 the Lodge an actual value of $41, 104, 470, reflecting a
 dramatic increase in the property's value from the
 previous assessment.

 ¶14
 LPI appealed this valuation to respondent Eagle County Board
 of Equalization, which denied the appeal. LPI then appealed
 to petitioner Board of Assessment Appeals ("BAA"),
 contending that the Eagle County assessor had improperly
 included in its value calculation the income that VBC
 generated in connection with its rental management agreements
 with the condominium owners. In connection with its appeal,
 LPI requested that the BAA reduce the Lodge's assessed
 value to $22, 800, 000.

 ¶15
 The BAA subsequently held a two-day evidentiary hearing on
 LPI's appeal. At this hearing, LPI asserted that
 VBC's net condominium management revenues constituted
 intangible assets that were exempt from property taxes under
 section 39-3-118, C.R.S. (2021). Consistent with this view,
 LPI submitted to the BAA income and expense statements
 showing the historical income and expenses of the Lodge,
 without including the net income from VBC's rental
 management agreements.

 ¶16
Eagle County responded that the net income derived by VBC
 from the condominium rentals was a real estate ownership
 benefit that would be factored

 into any acquisition pricing of the Lodge and therefore this
 net income was neither business income nor an intangible
 asset.

 ¶17
 The BAA ultimately found LPI's income and expense
 analysis to be more credible than that submitted by Eagle
 County and thus further found that LPI had properly excluded
 from its Lodge valuation analysis the net income that VBC
 received in connection with its contractual services for the
 condominium owners. Specifically, the BAA concluded that
 VBC's net rental management income "constituted an
 intangible asset that, while it might be considered in the
 valuation of a property outside of taxation, did not reflect
 additional value to the subject real estate."

 ¶18
 In so concluding, the BAA acknowledged Eagle County's
 position that a key factor in the valuation analysis was
 whether the value of the rental management income is appended
 to the property and is thus transferable with the property,
 or whether it is independent of the property so that the
 value either stays with the seller or dissipates upon the
 sale of the subject property. In light of the evidence before
 it, the BAA determined that any contributory value of the
 rental management income associated with the rental
 management agreements would not transfer with the Lodge in
 the event of a sale, "as that operation is independent
 of the subject hotel." Thus, the BAA concluded that this
 income was not to be included in the Lodge's valuation,
 and after applying a 5.5 percent capitalization

 rate to the taxable value of the property, the BAA assigned
 the Lodge an actual value of $26, 245, 000 for tax year 2017.

 ¶19
Eagle County then appealed the BAA's order to our court
 of appeals. In its appeal, Eagle County argued, among other
 things, that the BAA had erred in (1) determining that the
 Lodge's value for tax purposes was different from its
 valuation in the marketplace "outside of taxation"
 and (2) concluding that the net income derived from VBC's
 rental management services is an "intangible asset"
 that does not add value to the Lodge and is therefore not to
 be included in the calculation of the Lodge's assessed
 value.

 ¶20
 In a unanimous, published opinion, the division vacated the
 BAA's order. Lodge Props., Inc. v. Eagle Cnty. Bd. of
 Equalization, 2020 COA 138, ¶ 47, 490 P.3d 911,
 919. In so ruling, the division agreed with Eagle County on
 both of the foregoing issues. Id. at ¶¶
 19, 26, 39-42, 490 P.3d at 915-16, 918-19.

 ¶21
 With regard to the first issue, concerning market value and
 valuation for tax purposes, the division began by observing
 that a property's actual value is synonymous with market
 value, or "what a willing buyer would pay a willing
 seller under normal economic conditions." Id.
 at ¶ 19, 490 P.3d at 915 (quoting Bd. of Assessment
 Appeals v. Colo. Arlberg Club, 762 P.2d 146, 151 (Colo.
1988)). The division then opined that the BAA had derived a
 standard for calculating the actual value of property for tax
 purposes that is different from the standard used

 for other purposes, although the legislature had never
 indicated an intent to draw such a distinction. Id.
 at ¶ 21, 490 P.3d at 915. Thus, the division concluded
 that the Lodge's actual value had to be measured by its
 market value, and because, in the division's view, the
 contributory value of the rental management income would be a
 factor considered by a willing buyer and a willing seller in
 any sale of the Lodge, that income had to be included in the
 value calculation. Id. at ¶¶ 22-26, 490
 P.3d at 915-16.

 ¶22
 As to Eagle County's argument concerning whether
 VBC's net rental income was an intangible asset, the
 division reasoned that unlike other commonly recognized
 "intangibles" (e.g., patents, business goodwill,
 computer programs, literary rights, and stock options),
 VBC's net rental management income "is, in fact,
 cash; it is a tangible, inherent benefit in the form of money
 that is a direct product of the core income-producing
 business of [the Lodge]." Id. at ¶ 39, 490
 P.3d at 918. The division thus concluded that the BAA had
 erred in finding that VBC's net rental management income
 was an intangible that was to be excluded from the
 calculation of the Lodge's assessed value, and the
 division vacated the BAA's order and remanded the case
 with instructions that the BAA determine the Lodge's
 actual value after including in its calculation VBC's net
 income from the condominium rentals. Id. at ¶
 41-42, 490 P.3d at 918-19.

 ¶23
 The BAA and LPI each petitioned for certiorari review, and we
 granted their respective petitions.

 II.
Analysis

 ¶24
We begin by setting forth our applicable standard of review.
Next, we discuss the constitutional and statutory frameworks
 governing the valuation of property for tax purposes. We then
 consider whether the net income derived from the condominium
 management fees paid to VBC was generated by the Lodge, such
 that this income should have been included in the Lodge's
 actual value under the income approach to valuation.

 A.
Standard of Review

 ¶25
We presume that an assessor's valuation of property for
 taxation is correct. Cantina Grill, JV v. City &
 Cnty. of Denver Cnty. Bd. of Equalization, 2015 CO 15,
 ¶ 15, 344 P.3d 870, 876. To rebut this presumption, a
 taxpayer who challenges an assessor's valuation bears the
 burden of proving, by a preponderance of the evidence, that
 the valuation is incorrect. Id.

 ¶26
 It is the BAA's function, and not that of a reviewing
 court, to weigh the evidence and to resolve conflicts
 therein. Jefferson Cnty. Bd. of Cnty. Comm'rs v. S.T.
 Spano Greenhouses, Inc., 155 P.3d 422, 424 (Colo.App.
2006). Thus, an appellate court may overturn an order of the
 BAA "only if it finds an abuse of discretion, or that
 the order was arbitrary and capricious, based upon clearly
 erroneous factual

 findings, unsupported by substantial evidence in the record,
 or otherwise contrary to law." Hinsdale Cnty. Bd. of
 Equalization v. HDH P'ship, 2019 CO 22, ¶ 19,
 438 P.3d 742, 747. Whether net rental management income
 generated from the rental of condominium units that are
 physically integrated into a resort property should be
 included in the actual value of that property under the
 income approach to valuation is a question of law that we
 review de novo. See id. (noting that we review
 questions of law de novo).

 B.
Real Property Taxation and Valuation

 ¶27
 Article X of the Colorado Constitution sets forth the basic
 framework for taxation in Colorado. Article X, section
 3(1)(a) provides, in pertinent part:

The actual value of all real and personal property not exempt
 from taxation under this article shall be determined under
 general laws, which shall prescribe such methods and
 regulations as shall secure just and equalized valuations for
 assessments of all real and personal property not exempt from
 taxation under this article. Valuations for assessment shall
 be based on appraisals by assessing officers to determine the
 actual value of property in accordance with provisions of
 law, which laws shall provide that actual value be determined
 by appropriate consideration of cost approach, market
 approach, and income approach to appraisal.

 ¶28
 The General Assembly has codified this taxation framework in
 a number of statutes that bear on the issues now before us.

 ¶29
 For example, section 39-1-103(5)(a), C.R.S. (2021), provides,
 in part:

All real and personal property shall be appraised and the
 actual value thereof for property tax purposes determined by
 the assessor of the county wherein such property is located.
The actual value of such

 property, other than [certain exceptions not applicable
 here], shall be that value determined by appropriate
 consideration of the cost approach, the market approach, and
 the income approach to appraisal.

 ¶30
 Section 39-5-104, C.R.S. (2021), in turn, provides,
 "Each tract or parcel of land . . . shall be separately
 appraised and valued, except when two or more adjoining
 tracts, parcels, or lots are owned by the same person, in
 which case the same may be appraised and valued either
 separately or collectively."

 ¶31
 As the foregoing authorities make clear, assessors must
 separately appraise and value each legally distinct parcel of
 real property, and the title holders of each separate parcel
 are responsible for the taxes on those parcels. See
 Hinsdale Cnty. Bd. of Equalization, ¶ 22,
 438 P.3d at 747 ("Colorado's tax statutes reflect
 the legislature's intent to levy property tax on the
 record fee owner of real property."). Real property
 includes "[a]ll lands or interests in lands to which
 title or the right of title" has been acquired from the
 United States government or the state, as well as
 "improvements." § 39-1-102(14)(a), (c), C.R.S.
 (2021). Intangible personal property, in contrast to real
 property, is exempt from the levy and collection of property
 tax. § 39-3-118.

 ¶32
 The dispute before us centers on how the Eagle County
 assessor calculated the value of the Lodge under the income
 approach to valuation. As we have previously observed, the
 income approach is a common method for calculating the value
 of commercial properties. Bd. of Assessment Appeals v.
 E.E. Sonnenberg &

Sons, Inc., 797 P.2d 27, 30 n.8 (Colo. 1990). This
 approach "generally involves calculating the income
 stream (rent) the property is capable of generating,
 capitalized to value at a rate typical within the relevant
 market." Id.; see also Denver Urb. Renewal
 Auth. v. Berglund-Cherne Co., 568 P.2d 478, 480 (Colo.
1977) ("The capitalization of income approach is
 utilized by appraisers to formulate an opinion as to value
 which reflects the net income generated by the property
 during the remainder of its productive life."); 16
 Eugene McQuillin, The Law of Municipal Corporations
§ 44:143, at 632 (3d ed. 2013) (explaining that the
 income approach involves "determining the rental value
 of the property, deducting from it the operating expenses,
 and, if there is a profit, capitalizing the net profit at a
 percentage commensurate with the amount of risk
 involved").

 C.
Application

 ¶33
 Turning then to the facts before us, we must determine
 whether the net income that VBC derived in connection with
 its rental management agreements is part of the income stream
 that the Lodge is capable of generating, such that this net
 income is properly considered in valuing the Lodge under the
 income approach. We conclude that it is not.

 ¶34
 It is undisputed that the Lodge and the condominiums are
 legally separate and distinct parcels of real property, and
 therefore, these properties must be separately appraised and
 valued. Accordingly, rental income generated by the

 condominiums cannot be assigned to the Lodge, which is a
 separate parcel of real property owned by a different
 taxpayer. The question thus becomes whether VBC's net
 rental management income was generated by the condominiums,
 or whether it was, in fact, generated by the Lodge. For
 several reasons, we conclude that this net income was
 generated by the condominiums.

 ¶35
 First, on its face, the income at issue resulted from rentals
 of the condominiums. The condominium owners, at their option,
 chose to rent their condominiums to others, and, as a matter
 of contract law, the fees paid by the renters were for the
 use of the condominiums. The fact that the owners then paid
 VBC a fee for its rental management services does not alter
 the fact that the income was derived from the condominium
 rentals.

 ¶36
 Second, and related to the first point, we perceive no basis
 for taking VBC's net rental management income, which was
 paid from the condominium owners' rental income, and
 allocating that income to LPI's ownership of the Lodge.
VBC owns no real property at all, so its contractual income
 was not generated by any real property of VBC's. Nor can
 we say that VBC's contractual income either was generated
 by the Lodge or was somehow attributable to LPI's
 ownership of the Lodge. To the contrary, in our view,
 VBC's rental management income is precisely what the
 rental management agreements say it is: "compensation
 for the management services provided under this
 Agreement," including managing and

 operating the condominiums as rental units and offering and
 renting those units to transient guests when not occupied by
 the owners or the owners' guests; implementing a standard
 of maintenance, repair, service, and operation; establishing
 rental rates and collecting payment for condominium rentals;
 providing daily housekeeping services; marketing the
 condominium units; performing routine repairs and minor
 maintenance; and, at the owners' option, managing the
 payment of any assessments or fees due to the condominium
 association. Simply stated, VBC's rental management
 agreements are contracts for VBC's management services,
 paid for out of net rental income generated by the
 condominiums; the agreements are not contracts for an
 interest in (or the use of) the Lodge's real property.

 ¶37
 Third, and notwithstanding Eagle County's suggestion to
 the contrary, VBC's rental management agreements are not,
 in reality, contracts for the use of the Lodge's real
 property and amenities. Were we to accept such an argument,
 we would need to disregard most of the language of VBC's
 rental management agreements (and the fact that the
 agreements pertain to rentals of the condominiums, which are
 separate parcels of real property from the Lodge). We,
 however, may not do so. See Owners Ins. Co. v. Dakota
 Station II Condo. Ass'n, 2019 CO 65, ¶ 32, 443
 P.3d 47, 51 (noting that courts give effect to the intent and
 reasonable expectations of contracting parties by enforcing
 the plain language of

 their contract); McShane v. Stirling Ranch Prop. Owners
 Ass'n, 2017 CO 38, ¶ 16, 393 P.3d 978, 982
("[W]e hold no authority to rewrite contracts and must
 enforce unambiguous documents in accordance with their
 terms."); U.S. Nat'l Bank of Denver v.
 Bartges, 210 P.2d 600, 606 (Colo. 1949) (noting that
 courts do not have the authority to ignore a contract that
 was fairly and intelligently made by the parties).

 ¶38
 In so concluding, we acknowledge the contractual provision
 stating, "Manager will provide Hotel Guests and Owner
 access to all amenities within the Hotel that are available
 to other guests of the Hotel." Contrary to Eagle
 County's assertions, however, this language does not
 establish that the condominium owners must contract with VBC
 to secure access to the Lodge's amenities and that,
 therefore, the Lodge, and not the condominiums, is actually
 generating the net rental management income.

 ¶39
 For one, the spa referenced in the rental management
 agreements is open to the public. Moreover, as noted above,
 condominium guests pay a hotel resort fee that allows them to
 use the Lodge's amenities. And, as also noted above, the
 condominium owners pay condominium association fees that, in
 part, offset the costs of maintaining the Lodge's
 amenities, and a management agreement between the condominium
 association, LPI, and a number of its associated entities
 provides that "[b]ell services, concierge services, ski
 storage," and other services "shall be provided to
 all owners, their guests, and invitees." These facts
 belie any

 assertion that VBC serves as a gatekeeper to the Lodge's
 amenities, such that access to the Lodge's amenities is
 what condominium owners are actually contracting for in their
 rental management agreements with VBC.

 ¶40
 Nor does the fact that some condominium owners use VBC,
 rather than a less expensive rental management service
 provider, show that the rental management agreements between
 the condominium owners and VBC were actually contracts for
 access to the Lodge's amenities. Eagle County contends
 that, were it not for the access to amenities that VBC
 provides, "prudent condo owners would exclusively
 utilize vacation-rental-by-owner services that charge between
 3% and 15% of gross revenues for limited marketing and
 reservation services," such as Vrbo and Airbnb, rather
 than paying a forty percent fee to VBC. This argument ignores
 the fact that entities like these do not provide the same
 cleaning, customer-relations, booking, maintenance, and other
 services that VBC offers. See, e.g., Vrbo, All FAQs,
 https://host.expediagroup.com/vrbo/en-us/help/all-faqs
 [https://perma.cc/9NQM-85A9]. Nor do these entities share
 VBC's access to the Lodge's platform for marketing
 and booking available units, which many condominium owners
 may view as providing added value. Accordingly,
 notwithstanding Eagle County's supposition to the
 contrary, a prudent condominium owner might well choose to
 contract with VBC, irrespective of any access to the
 Lodge's amenities.

 ¶41
 For all of these reasons, we conclude that the net income
 generated from rentals of the individually and separately
 owned condominiums was not income generated by the Lodge, and
 therefore this income should not have been included in the
 Lodge's actual value under the income approach to
 valuation. See E.E. Sonnenberg & Sons, Inc., 797
 P.2d at 30 n.8 (explaining that the income approach involves
 calculating the income stream that "the property is
 capable of generating").

 ¶42
We respectfully believe that, in reaching a contrary
 determination, the division below erred in several ways.

 ¶43
 First, the division construed "the foundation of the
 income approach to valuation" as "the
 capitalization of such income streams attributable to
 property ownership." Lodge, ¶ 39, 490
 P.3d at 918 (emphasis added). This, however, is not the
 correct standard. As noted above, the income approach
 requires the assessor to consider the income that the
 "[subject] property is capable of generating."
E.E. Sonnenberg & Sons, Inc., 797 P.2d at 30
 n.8. By including VBC's net rental management income
 within the sweep of income "attributable to property
 ownership," the division impermissibly expanded the
 income approach to include in the Lodge's valuation
 contractual rights to revenue generated by a different
 property.

 ¶44
 Second, although a property's market value is certainly a
 measure of property valuation for tax purposes, see Bd.
 of Assessment Appeals v. Sampson, 105 P.3d 198, 203
(Colo. 2005), in concluding that the net rental management
 income at issue was part of the Lodge's market value, the
 division appears to have substituted its own factual finding
 for that of the BAA. Specifically, after observing that
 "[a] property's actual value is synonymous with
 market value," the division focused its analysis on
 whether VBC's net rental management income would factor
 into "what a willing buyer would pay a willing seller
 under normal economic conditions" upon the sale of the
 Lodge. Id. at ¶ 19, 490 P.3d at 915 (quoting
Colo. Arlberg Club, 762 P.2d at 151). The division
 opined that it would, stating, "[W]e are hard-pressed to
 believe that a purchaser of [the Lodge] would agree to the
 sale without also securing the rental contracts that would
 allow it to collect over $3.6 million in rental
 revenue." Lodge, ¶ 24, 490 P.3d at 916.

 ¶45
 In so finding, however, the division appears to have
 rejected, as unsupported by the record, the BAA's express
 determination that "any contributory value of the rental
 management income associated with the management of the
 third-party owned condominiums would not transfer with the
 subject hotel in the event of sale, as that operation is
 independent of the subject hotel." But the BAA's
 finding was, in fact, supported by evidence in the record
 before it. For example, the Lodge's expert expressly
 testified that the

 condominium management is separate and divisible from the
 Lodge's real property, noting that the
 rental management could be operated by third-parties having
 no ownership stake in the hotel. The expert further testified
 that the rental management income would not necessarily
 transfer upon the sale of the Lodge, and he opined that the
 Lodge's owner had no inherent right to manage any of the
 independently owned condominiums. Accordingly, the BAA's
 finding was neither arbitrary and capricious nor clearly
 erroneous, and it was therefore entitled to deference, even
 if other record evidence might have supported a contrary
 determination. See Hinsdale Cnty. Bd. of
 Equalization, ¶ 19, 438 P.3d at 747 ("An
 appellate court may set aside an order of the BAA only if it
 finds an abuse of discretion, or that the order was arbitrary
 and capricious, based upon clearly erroneous factual
 findings, unsupported by substantial evidence in the record,
 or otherwise contrary to law.").

 ¶46
 In addition to the foregoing, the division's market value
 analysis appears to have conflated the value of Vail Resorts
 (the ultimate parent company) and the value of the Lodge.
Although a Vail Resorts subsidiary's income might well
 impact Vail Resorts' market value, that is a different
 question from whether the same income can be said to have
 been generated by the Lodge, such that it should be included
 in the Lodge's valuation. Thus, although VBC also
 provides rental management services to condominium owners at
 the Ritz-Carlton Club in Vail (a

 different resort property), no one would argue that the
 income that VBC generates from providing those services would
 be relevant to the Lodge's valuation.

 ¶47
 Third, the division appears to have placed significant weight
 on the physical integration of the condominiums into the
 Lodge's building envelope, a position that Eagle County
 pursues here. Physical integration, however, does not alter
 the well-settled principle, discussed above, that legally
 distinct parcels of real property must be separately valued
 and appraised. Nor does physical integration alone establish
 that the income at issue was generated by the Lodge.

 ¶48
 In reasoning to the contrary, the division cited no
 applicable authority indicating that the physical integration
 of two otherwise separate properties justifies including
 income generated by one property in the value of the other.
And although Eagle County now argues that the Wisconsin
 Supreme Court's reasoning in ABKA Limited Partnership
 v. Board of Review, 603 N.W.2d 217 (Wis. 1999), is
 directly on point and supports the division's ruling, we
 disagree. ¶49 In ABKA, the Wisconsin Supreme
 Court considered whether an assessor properly included in the
 valuation of a resort hotel the hotel owner's income from
 the management of rental condominiums that were located
 adjacent to the hotel. Id. at 219-20. The court
 concluded that the rental management income was properly
 included in the hotel's valuation pursuant to the income
 approach because that income was "inextricably
 intertwined" with the hotel. Id. at 225.

Specifically, in the court's view, the management fees
 were generated both by and on the land on which the hotel was
 located, and the ability to earn such fees was transferable
 to future hotel purchasers. Id. Thus, the court
 concluded that the income "appertain[ed]" to the
 hotel under Wisconsin law. Id.

 ¶50
ABKA is distinguishable from the case before us,
 however, because the statute underlying the decision in that
 case was different from the statute underlying our ruling
 here. Specifically, under applicable Wisconsin law,
 "real property" includes "not only the land
 itself but all buildings and improvements thereon, and all
 fixtures and rights and privileges appertaining
 thereto." Wis.Stat. § 70.03 (2021) (emphasis
 added). Colorado law, in contrast, does not include within
 its definition of real property "rights and privileges
 appertaining" to land or improvements. See
§ 39-1-102(14). And it is worth noting that in Adams
 Outdoor Advertising, Ltd. v. City of Madison, 717 N.W.2d
 803, 821-22 (Wis. 2006), the Wisconsin Supreme Court pointed
 out the limitations to the rule that it adopted in
 ABKA, stating that the court's holding in
 ABKA derived from Wisconsin's particular
 definition of real property.

 ¶51
 Specifically, in Adams, the court observed, "A
 review of the cases leading up to ABKA demonstrates
 that inclusion of business value in a property assessment
 should be the exception, not the norm." Id. at
 821. The court further noted that "integral to the
 analysis" in ABKA and several cases like it
 "was the conclusion

 that the income appertained to the real property under
 Wis.Stat. § 70.03, and therefore, was a proper element
 to include in the real estate assessment under [the
 applicable Wisconsin statute]." Id. at 822. The
 Adams court continued, "The conclusions in
 these cases depend upon the definition of real property in
 Wis.Stat. § 70.03, which includes 'all buildings and
 improvements thereon, and all fixtures and rights and
 privileges appertaining thereto[.]'"
Id. (quoting Wis.Stat. § 70.03) (emphasis in
 original). The court therefore concluded, "Thus, in
 ABKA the management income derived from adjacent
 real estate could be included in the assessment because the
 physical proximity and interdependency of the real estate
 meant the income was a privilege appertaining to the
 subject real estate, rather than the product of the
 owner's skill and business acumen." Id.
(emphasis added); accord Walgreen Co. v. City of
 Madison, 752 N.W.2d 687, 704-05 (Wis. 2008).

 ¶52
 Accordingly, the Wisconsin case law on which Eagle County
 relies is inapposite.

 ¶53
 Finally, we are unpersuaded by the public policy concerns and
 parades of horribles posited by Eagle County and its amicus.
Although Eagle County states that the conclusion we reach
 today encourages corporations to evade taxes by
 "engaging in gamesmanship or manipulation of their
 corporate entity structures," we perceive no basis for
 any assertion of tax evasion, manipulation, or gamesmanship
 on LPI's (or any other party's) part here. At best,
 Eagle County

 points to the fact that LPI and VBC are part of a network of
 companies within Vail Resorts' corporate structure.
Although Eagle County perceives something nefarious about
 this, such an interlocking network of related entities
 serving different roles within a corporate entity's
 family is common and does not alone establish a corporate
 scheme to avoid taxation. Indeed, we have seen no evidence in
 the record before us to suggest that any person or entity in
 this case has avoided paying real property or other taxes
 properly levied. Nor can we conclude that VBC's revenue
 from providing contractual management services to the
 condominium owners was generated by the Lodge merely because
 VBC (either directly or through subcontractors) happened to
 be the entity providing such services.

 ¶54
We likewise do not agree with amicus Colorado Counties,
 Inc.'s ("CCI's"), contention that including
 income from VBC's rental management agreements in the
 valuation of the Lodge is necessary to maintain
 "uniformity and fairness." According to CCI, as a
 result of the conclusion we reach today, "every
 commercial property will be assessed according to its unique
 corporate ownership structure and corporate financing
 methods, and property owners will be subject to taxes not
 imposed on others." This, CCI suggests, will sow discord
 because "[n]o corporate structure is the same."

 ¶55
 Notwithstanding CCI's expressed concerns, the conclusion
 that we reach today requires an assessor employing the income
 approach to do no more than determine which real property has
 generated the income at issue before including that income in
 the value calculation. This, however, is an analytical step
 that the income approach has long required. And to the extent
 that an assessor perceives questionable dealings undertaken
 to avoid taxation, the assessor and courts have long had (and
 have utilized) tools to assess such transactions, and nothing
 we say today imposes any additional burden on assessors.
See Hinsdale Cnty. Bd. of Equalization, ¶ 27,
 438 P.3d at 748 (noting that doctrines such as the
 substance-over-form and economic substance doctrines are
 available to "call out questionable transactions
 undertaken to minimize or avoid income tax by requiring a
 transaction to comply with the underlying purpose of a tax
 statute and not just its language").

 ¶56
 CCI further reminds us that counties rely on property tax
 revenues to fund "schools, libraries, fire protection,
 water, sanitation, law enforcement, and infrastructure."
We are, of course, sympathetic to the financial strain on
 Colorado counties, particularly in light of today's
 economic realities and infrastructure needs. We, however, are
 not at liberty to ignore the long-settled principles of real
 estate valuation and taxation that compel the conclusion that
 we reach today.

 ¶57
 Accordingly, we conclude that the net income generated by VBC
 from the rental management agreements between it and the
 condominium owners was not income generated by the Lodge and
 therefore should not have been included in the Lodge's
 valuation under the income approach to valuation.

 ¶58
 In light of this disposition, we need not consider whether
 the net rental income at issue also constituted intangible
 personal property, requiring that it be excluded from the
 Lodge's valuation under the income approach.

 III.
Conclusion

 ¶59
 Contrary to Eagle County's assertions and the conclusion
 of the division below, the net rental management income
 realized by VBC from its rental management agreements with
 third-party condominium owners was not income generated by
 the Lodge. Accordingly, the division below erred in
 concluding that such income was to be included in the
 Lodge's actual value under the income approach to
 valuation.

 ¶60
We therefore reverse the judgment of the division below, and
 we remand this case for further proceedings consistent with
 this opinion.

---------

Notes:

[1] The specific issues on which we
 granted certiorari were framed as follows:

1. Whether the court of appeals erred by holding that
 a hotel's contractual right to net rental income
 generated from separately owned, but physically integrated,
 condominium units is not intangible personal property that
 must be excluded under section 39-3-118, C.R.S. from the
 actual value of the hotel under the income approach to
 valuation in section 39-1-103(5)(a), C.R.S.

2. Whether the court of appeals erred by holding, for
 the first time, that the net income generated from rentals of
 individually and separately owned condominium units to guests
 of a hotel should be included in the actual value of the
 hotel under the income approach to valuation.

---------