23CA1103 Jankovic v Jefferson Cnty Bd 03-06-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1103
Jefferson County District Court No. 22CV233
Honorable Lindsay L. VanGilder, Judge

Milan Jankovic,

Plaintiff-Appellant,

v.

Jefferson County Board of Equalization,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE HARRIS
Brown and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 6, 2025

Milan Jankovic, Pro Se

Kimberly Sorrells, County Attorney, Amy L. Padden, Assistant County Attorney, Amber J. Munck, Assistant County Attorney, Golden, Colorado, for Defendant-Appellee

¶ 1 After the Jefferson County Board of Equalization (BOE) valued property owned by Milan Jankovic for property tax purposes, Jankovic appealed the valuation to the district court. The district court affirmed the BOE's valuation. Jankovic again appeals, contending that the BOE and the district court made various errors in valuing the property. We affirm.

## I. Introduction

### A. Property Tax Principles

¶ 2 All taxable real property located in Colorado must be "listed, appraised, and valued for assessment." § 39-1-105, C.R.S. 2024; *see* Colo. Const. art. X, § 3(1)(a). Taxable real property includes all property that is not expressly exempted by law from taxation. § 39-1-102(16), C.R.S. 2024. The county assessor is charged with conducting this assessment. § 39-1-103(5)(a), C.R.S. 2024; *see* Colo. Const. art. X, § 3(1)(a); *Gilpin Cnty. Bd. of Equalization v. Russell*, 941 P.2d 257, 261 (Colo. 1997). The assessor uses the taxation scheme outlined in title 39 of the Colorado Revised Statutes, in addition to the appraisal procedures and instructions published in the Assessors' Reference Library, to ensure the fair and uniform taxation of all taxable real property in Colorado. *See*

1

*El Paso Cnty. Bd. of Equalization v. Craddock*, 850 P.2d 702, 704 (Colo. 1993); Colo. Const. art. X, § 3(1)(a); § 39-1-101.5, C.R.S. 2024; 3 Div. of Prop. Tax'n, Dep't of Loc. Affs., *Assessors' Reference Library* (rev. Dec. 2024) (ARL).

¶ 3        Real property includes "[a]ll lands" and "[i]mprovements." § 39-1-102(14)(a), (c).  Improvements are "all structures, buildings, fixtures, fences, and water rights erected upon or affixed to land." § 39-1-102(6.3).  The assessor is required to appraise and value the underlying land separate from any of the improvements on the land.  § 39-5-105(1); 3 ARL § 1, at 1.1.

¶ 4        The assessment of real property occurs in two phases: (1) valuation and (2) classification.  In the valuation phase, the assessor calculates the actual value of the property.  *See* § 39-1-103(5)(a).  This calculation is guided by three theories of appraisal — the cost, market, and income approaches — that are designed to estimate the market value of the property.  *Id.*; *Xerox Corp. v. Bd. of Cnty. Comm'rs*, 87 P.3d 189, 191 (Colo. App. 2003) (market value is synonymous with actual value).

¶ 5        The three approaches involve the following:

- The cost approach (also known as the anticipated use approach) involves estimating the cost of replacing the improvements to the property, less accrued depreciation.

- The market approach (also known as the sales comparison approach) involves an analysis of sales of comparable properties in the market.

- The income approach generally involves calculating the income stream (rent) the property is capable of generating, capitalized to value at a rate typical within the relevant market.

*Bd. of Assessment Appeals v. E.E. Sonnenberg & Sons, Inc.*, 797 P.2d 27, 30 nn.8-9, 31 n.12 (Colo. 1990). Although he must consider all three approaches, the assessor can rely on the approach he deems most appropriate for the property. *ASARCO, Inc. v. Bd. of Cnty. Comm'rs*, 916 P.2d 550, 553 (Colo. App. 1995). The assessor is also permitted to make adjustments within each of these approaches to account for specific characteristics of the land. *See* 3 ARL § 4, at 4.26. As applicable here, when an improvement is partially completed, the assessor's adjustments may be based on

the percentage of completion at the time of valuation. *Id.*; 3 ARL § 1, at 1.16-1.17.

¶ 6    In the classification phase, the assessor determines the actual use of the property on the date of assessment. 2 ARL § 6, at 6.1. Then, he chooses the most appropriate classification based on that use. *Id.* The classification of the property determines the assessment rate. *Id.*; *see, e.g.,* § 39-1-104, C.R.S. 2024 (describing the assessment rates for various property classifications).

¶ 7    Once the assessor has determined both the value and the assessment rate based on the classification of the property, these two figures are multiplied together to calculate the assessed value of the property. 2 ARL § 6, at 6.1. The assessed value is taxed each year.

¶ 8    If a taxpayer disagrees with the county assessor's assessment, he can seek review of the determination. § 39-5-122(2), C.R.S. 2024. First, the taxpayer can challenge the assessment before the county assessor. *Id.* If the assessor declines to make an adjustment, then the taxpayer can pursue an appeal to the county board of equalization. §§ 39-5-122(3); 39-8-106(1), C.R.S. 2024. The board can hold a hearing and take evidence from both parties.

4

§ 39-8-107(1), C.R.S. 2024. If the board denies the appeal in part or in full, the taxpayer can (1) seek de novo review at the Board of Assessment Appeals (BAA); (2) seek de novo review at the district court; or (3) submit the claim to arbitration. *Id.*

### B. Factual and Procedural Background

¶ 9 The property at issue is a 0.47-acre lot, zoned for mixed use, in Lakewood, Colorado. Jankovic purchased the property as a vacant lot.

¶ 10 In 2019, Jankovic obtained a construction permit to build a two-story building with a dental office for Jankovic's wife on the first floor and general office space on the second floor. Shortly after the permit was approved, Jankovic and his family began construction on the proposed building. Due to their experience and knowledge of construction, engineering, and dental practices, the Jankovic family did much of the construction work themselves.

### 1. Assessor's Assessment and Jankovic's Administrative Appeals

¶ 11 In 2022, the county assessor notified Jankovic that the property had been reclassified from vacant to commercial and that the value of the property had increased from $102,740 to $971,803.

Jankovic protested the valuation before the county assessor.  *See*
§ 39-5-122(2).  The assessor declined to reduce the valuation.

¶ 12     Jankovic challenged the valuation before the BOE.  *See*
§ 39-5-122(3); 39-8-108(1), C.R.S. 2024.  In that proceeding, the
assessor submitted a report reducing the value of the property from
$971,803 to $537,271 because he determined that the building was
twenty-five percent, instead of fifty percent, complete.  The BOE
adopted the reduced value of the property.

¶ 13     Jankovic appealed the BOE's decision to the district court.
*See* § 39-8-108(1).

## 2.    De Novo Trial in the District Court

¶ 14     Pursuant to section 39-8-108, Jankovic filed a complaint in
the district court disputing the BOE's valuation, including the
assessor's ability to assess a partially completed building, and
alleging that the BOE proceedings violated his constitutional rights.
He subsequently moved to amend the complaint but merely
reiterated his original claims.  The court denied the motion to
amend and, as relevant here, concluded that the constitutional

claims could not be resolved in the district court proceedings, which were limited to a review of the BOE's valuation.[1]

¶ 15    Both parties submitted witness lists before trial. The BOE disclosed its expert, Certified General Appraiser Robert Sayer from the Jefferson County Assessor's Office, who prepared an appraisal report for the property. Jankovic disclosed that he would be calling himself and his son as expert witnesses. In addition, he belatedly submitted a "rebuttal expert report" prepared by "Milosh LLC," an entity co-owned by him and his son. The BOE filed a preemptive motion to exclude Jankovic's proposed expert testimony and report. The district court deferred ruling on the motion until trial.

---

[1] On appeal, Jankovic reasserts his claim that the procedures at the BOE hearing violated his right to due process or were otherwise unfair and discriminatory. The district court, though, held a de novo hearing, meaning it considered the issues "as though no previous action had been taken." *Arapahoe P'ship v. Bd. of Cnty. Comm'rs*, 813 P.2d 766, 767 (Colo. App. 1990). And Jankovic does not contend that the de novo trial suffered from the same defects. Therefore, we conclude that his claims about the BOE proceedings are moot. *See, e.g., Anderson v. Applewood Water Ass'n*, 2016 COA 162, ¶¶ 26, 31 (a claim is moot when relief is unnecessary to remedy an existing controversy or prevent its reoccurrence or when the relief requested, if granted, would have no practical effect on the matter under review); *cf. O'Neil v. Conejos Cnty. Bd. of Comm'rs*, 2017 COA 30, ¶ 10 (declining to review the assessor's classification determination when the BAA held a de novo hearing).

¶ 16    The district court held a two-day de novo trial. *See* § 39-8-108(1). During his opening statement, Jankovic argued that the state lacked authority to tax a partially constructed building and that the BOE overvalued his property. In his testimony, after emphasizing his family's history and hard work on the construction of the building, Jankovic questioned the discrepancies between the initial valuation and the BOE's reduction. On cross-examination, Jankovic admitted that he had never worked as a real estate appraiser, was not familiar with the ARL, and was not a licensed appraiser.

¶ 17    Jankovic's son testified next. The son clarified the methodology that Jankovic used to calculate the value of the property in the rebuttal appraisal report. He opined that "from a dental specific standpoint, you can't sell a dental building under construction to a dental — no dental company, first of all, can buy that legally, it's in all their policies." The son insisted that dental companies are only looking for completely constructed buildings because of the specialized nature of office space in the dental industry. According to his theory, "destruction [of the partially constructed building] has to occur," so the building had a negative

8

value based on the destruction costs. The son also offered photo evidence purportedly showing that certain construction milestones had not been reached.

¶ 18    On cross-examination, the son could not identify any support for his valuation method, either in the ARL or elsewhere. He also admitted that he was not a licensed appraiser and did not have any specialized appraisal experience.

¶ 19    Jankovic also called his daughter and wife, who offered testimony in support of Jankovic's position that a building should not be valued before a certificate of occupancy is issued. The wife confirmed that the building was intended to house her dental practice.

¶ 20    After Jankovic rested, the BOE called its only witness, the appraiser. The appraiser testified that he had a license in both commercial and residential appraisal and forty-six years of industry experience. The parties agreed that the appraiser was an expert in commercial appraisal.[2]

---

[2] On appeal, Jankovic argues that the court erred by qualifying the appraiser as an expert. But because he agreed at trial that the appraiser could testify as an expert, he has waived any claim of

¶ 21    The appraiser testified that he first valued the land as if it were vacant, then separately valued the partially constructed building. The appraiser considered the cost, income, and market approaches in preparing his report but determined that the cost approach was the best method because he was "able to best duplicate what the builder, or developer, or owner [wa]s actually doing step by step and stage at certain dates and time."

¶ 22    The appraiser concluded that the land, as vacant, was worth $205,480 based on other comparable properties sold in the area. Next, he calculated the value of the improvement (the building) under the cost approach. Based on the materials Jankovic used for construction, the appraiser calculated that the replacement cost of the completed building was $149.31 per square foot, or $1,437,208 total (including adjustments for the local and current cost multipliers). Because the building was newly constructed, it was

---

error. *See Meier v. McCoy*, 119 P.3d 519, 522 (Colo. App. 2004). But even if Jankovic had preserved his claim, the record contains ample evidence that the appraiser was qualified to testify as an expert in this case. *See Colo. Arlberg Club v. Bd. of Assessment Appeals*, 719 P.2d 371, 374-75 (Colo. App. 1986) (witness who was part owner of appraisal business with seven years of experience was properly qualified as a tax appraisal expert), *rev'd on other grounds*, 762 P.2d 146 (Colo. 1988).

not necessary to make an adjustment for depreciation. But he did reduce the total replacement cost by seventy-five percent, to reflect that the building was only twenty-five percent completed. He made this determination because he observed that the framing for all floors was complete and that the utilities were extended from the main service. He arrived at an actual value of $359,302 for the improvement. Adding both values together, he determined the total value of the land and the improvement was $564,782.

¶ 23     After hearing both sides, the district court entered its findings. It determined that there was no "support in the statute or case law or otherwise [for Jankovic's theory] that the 'cost approach' would require demolition of any improvements." It acknowledged that Jankovic had presented evidence of some costs of construction, but it found that Jankovic had failed to submit "costs for the wood framing materials, which [were] substantial with the size of this building, [and] roofing materials." Those omissions led the court to conclude that all the costs of construction had not been fully disclosed, and therefore, the actual cost of the building could not be determined from the receipts that Jankovic had submitted. It also

found that the son's arguments regarding a hypothetical dental company lacked merit.

¶ 24    In contrast, the court found that the appraiser's testimony and report were "consistent with" section 39-1-103(5)(a) and the cost approach. It adopted the appraiser's determination that the building was twenty-five percent complete. In making that determination, the court found that based on the photos submitted, the rough framing was complete for each floor, and "in order for work to be going on inside the building, [workers] would need access to electricity, lights, things to run power tools, et cetera." The court concluded that "if there [wa]s access, some access from the main service, that [wa]s enough" to clear the threshold for a finding that the building was twenty-five percent complete. Because the BOE did not request an increase in value to meet the appraiser's valuation, the district court affirmed the BOE valuation of $537,271.

## II.    Jankovic's Contentions on Appeal

¶ 25    As we understand his argument on appeal, Jankovic contends that the district court's valuation is incorrect for two reasons. First, he alleges that the state cannot tax a partially completed building.

Second, he says that even if the state can tax a partially completed building, the assessor applied, and the district court adopted, the wrong method of valuation.

## A. Standard of Review

¶ 26 The district court reviews the board's decisions de novo, meaning it makes "an entirely independent determination." *Arapahoe P'ship v. Bd. of Cnty. Comm'rs*, 813 P.2d 766, 768 (Colo. App. 1990). The taxpayer bears the burden of proof and, to prevail, must show by a preponderance of the evidence that the assessor's valuation is incorrect. *Lodge Props., Inc. v. Eagle Cnty. Bd. of Equalization*, 2022 CO 9, ¶ 25; *Arapahoe Cnty. Bd. of Equalization v. Podoll*, 935 P.2d 14, 18 (Colo. 1997). Whether the taxpayer has satisfied this burden is a question of fact for the district court to resolve. *See Cherry Hills Country Club v. Bd. of Cnty. Comm'rs*, 832 P.2d 1105, 1107 (Colo. App. 1992); *cf. Lodge Props., Inc.*, ¶ 26 ("It is the BAA's function, and not that of a reviewing court, to weigh the evidence and to resolve conflicts therein.").

¶ 27 On appeal, we must defer to the district court's factual findings if they are supported by evidence in the record. *Podoll*, 935

P.2d at 18. But we review any questions of law de novo. *Lodge Props., Inc.*, ¶ 26.

### B. Did the District Court Err by Determining that the State Can Tax a Partially Completed Building?

¶ 28 Jankovic first contends that the state cannot tax a partially completed building. We disagree.

¶ 29 The Colorado Constitution requires that all real property be assessed for taxation each year, unless a statutory exception applies. Colo. Const. art. X, § 3(1)(a). The General Assembly has prescribed specific exemptions for real property used for charitable, religious, educational, and other purposes. *See* §§ 39-3-101, -105 to -107, C.R.S. 2024. However, there is no statutory exemption for partially completed improvements. *See Larimer Cnty. Bd. of Equalization v. 1303 Frontage Holdings LLC*, 2023 CO 28, ¶ 49 (finding that where the legislature did not create an exception to the property tax code, an exception should not be read into the statute); §§ 39-3-101 to -138, C.R.S. 2024 (identifying statutory exemptions for various types and uses of property and the qualifying criteria for each exemption). The absence of an exemption indicates that the legislature intended that any improvements that add value to the

property would be assessed, regardless of whether the improvement is completed or not. *See* 3 ARL § 4, at 4.26 (permitting assessors to adjust for partial completion). In addition, the existence of percentage of completion guidelines indicates that partially completed improvements should be assessed. 3 ARL § 1, at 1.16 (outlining percent completion guidelines).

¶ 30    And on multiple occasions, the BAA has affirmed the valuation of partially completed commercial buildings in similar circumstances. *See Advanced Storage Kipling, LLC v. Jefferson Cnty. Bd. of Equalization*, No. 75101 (Colo. Bd. of Assessment Appeals Oct. 4, 2019) (final agency order) (BAA determined that partially constructed three-story self-storage property was twenty-five percent complete rather than fifty percent complete); *Trautner v. San Juan Cnty. Bd. of Equalization*, No. 76296 (Colo. Bd. of Assessment Appeals Feb. 26, 2021) (final agency order) (BAA determined that partially constructed garage was commercial property and was properly valued using the cost approach). Therefore, we conclude that the Colorado property tax code allows the state to value and assess taxes for partially completed improvements.

¶ 31    Jankovic has not identified any statutory provision that would exempt his partially constructed building from taxation. He attempts to repurpose the definition of a completed building from section 39-5-132(2)(a)(I)(B), C.R.S. 2024, to support his argument that the assessor cannot value his land until he has obtained a certificate of occupancy. But that portion of the statute only provides a definition for a completed building. It does not suggest that a partially completed building cannot be valued for assessment.[3]

¶ 32    As additional support for this argument, Jankovic points to an email from a bank representative attesting that the partially completed building had no value. Jankovic asserts that the trial court erred in excluding the email as hearsay. We disagree.

¶ 33    The email is hearsay. It is an out-of-court statement, offered by Jankovic for the truth of its contents. *See* CRE 802. And all hearsay is inadmissible at trial unless an exception applies. CRE

---

[3] In fact, we read this section as cutting against Jankovic's argument. The section permits the assessment of complete *and partially constructed* buildings more frequently in counties where there has been "severe growth" in the number of residential units to fund the resulting higher demand for public services in the county. § 39-5-132(2)(a)(I)(A), C.R.S. 2024.

801.  Jankovic does not identify an exception that would allow the email to be admitted.  *See People v. Garcia*, 826 P.2d 1259, 1264 (Colo. 1992) ("The burden of establishing the preliminary facts to establish the hearsay exception is on the proponent of the evidence.").  Therefore, it was inadmissible.  *See* CRE 801; *People v. Blackwell*, 251 P.3d 468, 477 (Colo. App. 2010) (finding that the trial court was correct to exclude evidence where no hearsay exception applied).

¶ 34    At any rate, the court permitted the son to testify about the content of the email.  Therefore, Jankovic presented the information he wanted the district court to consider — that, in the opinion of his banker, the partially completed building did not have any value *for mortgage purposes*.  The district court had discretion to give that evidence whatever weight the court thought it warranted.  *See Podoll*, 935 P.2d at 18.

¶ 35    For these reasons, we conclude that the district court properly determined that the State may value and assess a partially completed building for taxation purposes.

C. Did the District Court Err by Determining that the Assessor Applied the Correct Method for Valuing the Property?

¶ 36 Next, Jankovic contends that, even if the state may tax a partially completed building, the assessor used, and the district court adopted, an incorrect method that led to the overvaluation of his property. Again, we disagree.

¶ 37 To determine the actual value of the property, the assessor must appraise the value of the land separately from any improvements on the property. § 39-5-105(1). Jankovic agrees that the value of the land without any improvements is $205,480.

¶ 38 His disagreement is with the method of valuation for the improvement (building). Like the appraiser, Jankovic endorsed the cost approach.[4] But he says that the appraiser erred in implementing the method.

¶ 39 First, Jankovic argues that the appraiser should have used his actual costs (evidenced by receipts), instead of the replacement cost of the building (calculated using the Marshall & Swift Cost Estimator).

---

[4] Jankovic used the cost approach in his own appraisal report, which we interpret as an endorsement of this approach.

¶ 40    The cost approach requires the assessor to estimate the hypothetical cost of replacing any improvements to the property. 3 ARL § 2, at 2.17; Appraisal Inst., *The Appraisal of Real Estate* 533 (15th ed. 2020).  The assessor can use the cost of reproducing the exact materials used to create the improvement (reproduction cost) or can use the cost of replacing the improvement with a substitute (replacement cost).[5]  Appraisal Inst., at 533-34.  Calculating the replacement cost involves the use of a cost estimation service, which provides estimates of the cost of building materials in certain areas.  *Id.* at 533, 544.

¶ 41    Here, the appraiser used the replacement cost because it allows for equalization across all costs and because he did not receive a complete inventory of actual costs of construction.[6]  The district court also independently determined that the receipts

[5] Typically, a reproduction cost method is applied when the building is so unique that it is difficult to replicate, while a replacement cost method is applied when the building is constructed with a common design and materials.  Appraisal Inst., *The Appraisal of Real Estate* 533-34 (15th ed. 2020).  Using the replacement cost method often benefits the taxpayer because it accounts for deficiencies in construction and averages material costs in the area.  *Id.*

[6] The appraiser used Jankovic's receipts to determine the cost of materials in the region and the exact components used for the building.

Jankovic disclosed at trial were deficient.  Therefore, both the court and the assessor came to the same conclusion — that it was impossible to calculate the reproduction cost of the building, and it was therefore necessary to use the replacement cost.

¶ 42     Because either the replacement cost or reproduction cost method can be used to calculate value under the cost approach, *see* Appraisal Inst., at 533-34, it is within the appraiser's discretion to determine which method should be used for a particular property, *see Creekside at DTC, Ltd. v. Bd. of Assessment Appeals*, 811 P.2d 435, 438 (Colo. App. 1991) ("While we have recognized that, as a general rule, the method by which valuation for taxation purposes is to be formulated is not a judicial function, this court may, nevertheless, review an assessor's evaluation actions to determine whether the assessor has complied with pertinent constitutional and statutory requirements.").

¶ 43     Next, Jankovic contends that, instead of affirming the cost approach calculation performed by the appraiser, the district court should have recognized his alternative method for calculating the value of the building.

¶ 44    Using the replacement cost, the appraiser determined that the base cost for the improvement would be $158 per square foot. This cost accounted for the nature of the building ("multi-tenant office space"), the type of materials used to construct it ("wood or steel studs frame"), and the quality of construction ("good"). The cost per square foot was then adjusted for the perimeter and height of the building, yielding a cost of $149.31 per square foot. This figure was multiplied by the total square footage of the building, 9,436 square feet, to arrive at the total predicted value of the building, also known as the "replacement cost new less depreciation" — $1,437,208 (including adjustments for the local and current cost multipliers).

¶ 45    Jankovic argues that his cost approach calculation was superior, based on the "expert" report he and his son prepared. In the report, Jankovic asserted that demolition costs must be accounted for because of the "specific nature and layout of this construction project that would make all of the improvements unusable to the buyer." He concluded that the "best and most probable course of action of the buyer would be to demolish the building to clear the land for improvement suitable to the buyer."

He noted that the market for dental buildings "is decreasing as it is"; however, "even in a competitive dental market, the property could not sell due to being unfinished." So, according to his theory, the actual value of the property should be calculated by subtracting the cost of demolishing the partially constructed building, $110,000, from the value of the land, $205,480, to arrive at an actual value of $95,480. Although Jankovic never admitted the "expert" report into evidence at trial, his son explained the valuation's methodology during his testimony.

¶ 46 Jankovic's alternative methodology is inaccurate and unsupported. Jankovic's approach relies on two incorrect premises. First, Jankovic assumes that the building does not have any value because it is partially completed. However, as explained above, a partially constructed building does have value for tax purposes.

¶ 47 Second, he applies a quasi-market approach within his cost approach analysis to conclude that there is not a market for a partially constructed dental building, and therefore, the building must be demolished. But, according to appraisal principles, when the market approach cannot be used (because there are no

comparable properties), the assessor should use the cost approach. *See* 3 ARL § 2, at 2.17, 2.45. ("[The cost approach] is used primarily where sales are limited and the land is in transition."); *ASARCO*, 916 P.2d at 553-54 (determining that the cost approach was appropriate where a treatment facility was "not marketable and [did] not produce income"). Thus, Jankovic's alternative method does not hold up as a legitimate method for calculating the value of the property.

¶ 48   Jankovic's proposed valuation method is also unsupported. Jankovic has not provided, and we have not found, any support for his methodology in the statutory scheme, ARL, or general appraisal principles. As the trial court noted, Jankovic's method skips steps of the established method without justification and lacks authority at every stage. Instead of providing this authority, Jankovic relies on his son's purported expertise and argues that the court erred in declining to qualify him as an expert.

¶ 49   We disagree that the district court abused its discretion in this respect. True, Jankovic's son has education and experience in

engineering and construction.[7]  However, the party offering the

expert testimony must establish that a witness is qualified as an

expert by knowledge, skill, experience, training, or education to

offer an opinion on the subject in question.  CRE 702; *Brooks v.*

*People*, 975 P.2d 1105, 1114 (Colo. 1999) (requiring that a witness

be competent to render an expert opinion on the subject in question

and serve as the best conduit for that information to the court).

Jankovic did not show that his son had any qualifications *in*

*property appraisal*, and, on cross-examination, his son was not able

to provide support for his appraisal methodology.[8]  *Compare Melville*

*v. Southward*, 791 P.2d 383, 387 (Colo. 1990) (physician unfamiliar

with the standard of care was unqualified to testify as an expert),

*and Meier v. McCoy*, 119 P.3d 519, 522 (Colo. App. 2004) (court

properly declined to qualify witness as an expert because he "had

---

[7] Specifically, at the time of trial, Jankovic's son was a student at the Colorado School of Mines studying civil and electrical engineering and had worked on several engineering and plumbing projects.  He had also passed the Colorado State Plumbing Board Exam and the National Standard General Building Contractor Exam.

[8] Jankovic's son admitted that he was not a licensed appraiser (as is required in Colorado), and although he said he was familiar with certain portions of the ARL, he was unable to identify support for his alternative cost approach calculation.

not been trained or employed" in the subject area and was not otherwise qualified to opine on the subject), *with Colo. Arlberg Club v. Bd. of Assessment Appeals*, 719 P.2d 371, 374-75 (Colo. App. 1986) (part owner of appraisal business with seven years of experience was properly qualified as tax appraisal expert), *rev'd on other grounds*, 762 P.2d 146 (Colo. 1988).

¶ 50    Given all this, we see no error in the court's decision to adopt the assessor's valuation approach over Jankovic's unsupported approach.

¶ 51    Still, Jankovic contends that even if the appraiser's cost approach calculation was correct, the district court erred by finding that the building was twenty-five percent complete.

¶ 52    Once the replacement cost of the building has been calculated, the assessor is permitted to make adjustments to account for unique features, materials, or circumstances for the specific building. *See* 3 ARL § 4, at 4.26; Appraisal Inst., at 532. In this case, it was necessary to adjust for the fact that the building was partially completed. The ARL provides the following guidelines to

determine the percentage of completion for a partially constructed building:[9]

| Percent Complete | Description |
| --- | --- |
| 10 percent | Excavation, footing work, and foundation completed. |
| 25 percent | Exterior wall framing for all floors erected, utilities extended from main service to structure. |
| 50 percent | Rough framing, plumbing, electrical, and mechanical complete. |
| 75 percent | Partial interior finishes including dry wall, finish carpentry, cabinetry, and painting in progress. |
| 100 percent | Only final interior finish including plumbing and lighting fixture installation, floor coverings, and touch-up remaining. |

3 ARL § 1, at 1.16. "If all of the description of a percentage category has not been completed as of the assessment date, the lower percentage category where all of the description is complete should be used." *Id.*

¶ 53    Here, the appraiser determined, and the district court agreed, that construction had met and progressed beyond the criteria for

---

[9] At trial, the appraiser explained that, in his expert opinion, the guidelines for percentage completed in the ARL are the closest approximation available for partially completed buildings. And we defer to the expertise of the appraiser in this respect. *See Creekside at DTC, Ltd. v. Bd. of Assessment Appeals*, 811 P.2d 435, 438 (Colo. App. 1991).

twenty-five-percent completion because the exterior wall framing for all floors was complete and the utilities were extended from the main service.[10]  The following evidence supports the court's conclusion:

- The appraiser observed and photographed the completed exterior wall framing for both floors of the building.

- The appraiser observed and photographed the roof on the building.

- The appraiser observed and photographed the building's weatherproofing that protected the interior.

- Jankovic admitted that the plumbing system passed inspection.

- Jankovic submitted photographs of interior framing.

- The appraiser testified that, "based on the information [he] had, although [he] couldn't confirm it with Xcel

---

[10] The BOE initially determined that the building was fifty percent complete because it was being weather proofed and the plumbing system was completed and inspected, which led to the assumption that the electric and mechanical systems were also completed. Jankovic raised a challenge to these assumptions, and the BOE reduced the percent of completion from fifty percent to twenty-five percent, leading to a reduction in the assessed value of the building, from $971,803 to $537,271.

because it requires permission of the property owner, there is . . . service from the . . . power source, the line of the transformer, to . . . a service box and so it's available."

¶ 54    Jankovic argues that the trial court erred by finding that the electrical utility was extended from the main service and, therefore, by finding that the building was twenty-five percent complete.

¶ 55    At trial, Jankovic and his family members made only conclusory statements that the "electrical was not completed."[11]  It was only during closing argument that Jankovic alleged that there was a "construction meter . . . so that the construction crews can plug in their equipment, but it is not considered a utility connection because it cannot be used inside of the building."  Jankovic argued an electrical permit, showing that the final inspection had not been completed, was evidence that the electricity had not been extended from the main service.

---

[11] The record belies Jankovic's claim in his reply brief that "the fact that the electrical was not extended to the building was brought up and explained several times by [Jankovic] and other witnesses."

¶ 56    For the first time on appeal, Jankovic asserts that there was only temporary power going to the property. He claims that the electrical box on the building does not contain a "meter or cables" and that an empty electrical conduit was placed underground. In his reply brief, Jankovic explains that the temporary construction service electrical system is incompatible with the main service electrical system. For that reason, he asserts that the district court should have known that electricity was not extended from the main service.

¶ 57    But the district court was not provided with any of this information, nor any evidence to support it, at trial. Jankovic suggests that the district court judge should have been more familiar with construction electrical systems, presumably so that she could have drawn on her personal knowledge to fill in any evidentiary gaps. That is not how a trial works. It was Jankovic's burden to establish, through admissible evidence, that at least one of the utilities had not been hooked up. *See Lodge Props. Inc.*, ¶ 25. He did not carry that burden. Thus, based on the evidence before it, the district court found that the building was twenty-five percent complete. That finding is not clearly erroneous.

¶ 58    Finally, as best we understand it, Jankovic asserts that his property could not be reclassified because the actual use of the property will not be commercial until the building is completed.

¶ 59    An assessor can reclassify a property based on its actual, intended, or reasonable future use. *O'Neil v. Conejos Cnty. Bd. of Comm'rs*, 2017 COA 30, ¶ 16. The assessor can consider future use because it accounts for "what market participants perceive to be the future benefits of acquisition." *Colo. Arlberg Club*, 762 P.2d at 152-53 (citation omitted); *see Bd. of Cnty. Comm'rs v. DPG Farms, LLC*, 2017 COA 83, ¶ 13.

¶ 60    Commercial property is "used for activities 'having profit as a primary aim.'" *O'Neil*, ¶ 14. Jankovic does not dispute that he intends to use the property for profit-generating activities — namely, his wife's dental practice and office space for his engineering company. Jankovic's son and wife testified that they designed the building to specifically accommodate the unique features of a dental practice. *See Trautner*, No. 76296, slip op. at 5 (considering the design of the building as an indication of future

actual use).  Therefore, the assessor could reclassify Jankovic's property from vacant to commercial.[12]

¶ 61    Regardless, the value of the building (as opposed to the assessment rate applied to it) did not turn on its classification as "commercial."  The appraiser determined the value of the property by considering the nature of the building as an office building, the materials used to construct it, the quality of the construction, and the percentage of completion.

¶ 62    In sum, we conclude that the district court did not clearly err by adopting the appraiser's valuation.

### III.    Disposition

¶ 63    The judgment is affirmed.

JUDGE BROWN and JUDGE LUM concur.

---

[12] The reclassification also did not affect the rate at which Jankovic's property was taxed because for the 2022 tax year at issue here, the assessment rate for vacant and commercial classifications was the same, at twenty-nine percent.  *See* § 39-1-104(1.8)(b), C.R.S. 2022.